**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 25 1999**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

NORMAN L. BISHOP,

      Defendant-Appellant.

No. 97-2270
(D.C. No. CR-95-432-JP)
(D. New Mexico)

**ORDER AND JUDGMENT**[*]

Before **MURPHY, HOLLOWAY** and **MAGILL**,[**] Circuit Judges.

Norman L. Bishop was convicted after trial before a jury of the one charge against him, assault with a dangerous weapon with intent to do bodily harm in violation of 18 U.S.C. § 113(a)(3). He was sentenced to 41 months' imprisonment, to be followed by a three year period of supervised release. Mr. Bishop now brings this appeal from his conviction. We have jurisdiction under 28 U.S.C. § 1291. The district court had jurisdiction under 18 U.S.C. §§ 113 and 3231 because the traffic incident on which the indictment was based occurred on

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**]The Honorable Frank J. Magill, United States Senior Circuit Judge for the Eighth Circuit, sitting by designation.

federal premises, Kirtland Air Force Base, Albuquerque, New Mexico (within "the special maritime and territorial jurisdiction of the United States"). The indictment charged that Bishop committed an assault on April 8, 1994, by intentionally driving his vehicle into that of another.

## I

## A

Ms. Theresa McCarthy-Brow, the victim, testified that she was employed as a materials engineer at the Phillips Laboratory on Kirtland Air Force Base. [1] V R. at 19. In December 1993, defendant Bishop came to work in the same building where she worked. Bishop was a student and a part-time clerical employee. He worked in close proximity to McCarthy-Brow, his desk being only some ten feet from the door to her office. Id. at 20. On March 14, 1994, McCarthy-Brow received a note from Bishop. Id. at 21. The contents of the note were not revealed to the jury. Ms. McCarthy-Brow took the note home and showed it to her husband. She also gave a copy of the note, and of her written reply to her supervisor, Major Paul Chernek, telling him he needed it for his information and that it was rather odd to receive. Id. at 22. Ms. McCarthy-Brow also gave the original note, with her reply on the back, to Bishop. Id. at 21.

Major Chernek testified that he had worked at Kirtland at the time of the traffic

_____

[1]The government established the fact that the location of the collision was on the base and within the federal property and thus within "the special maritime and territorial jurisdiction of the United States." V R. at 71-73.

incident involving Bishop and Ms. McCarthy-Brow. He was a supervisor for both of them. V R. at 44-45. On March 15, 1994, he received the letter or note from Ms. McCarthy-Brow. He read it and then requested that Bishop come to see him to discuss the letter, which had a note on it from Ms. McCarthy-Brow responding to Bishop. Id. at 45.

Chernek testified that he met with Bishop on March 15, 1994, after receiving the letter from Bishop to McCarthy-Brow. Chernek told Bishop that his complaints "were overreacting to normal everyday office interaction." Id. at 52. Chernek said to civilian personnel that he thought Bishop's action was odd but not threatening. Id. at 52. Mr. Valenzuela, an Equal Employment Opportunity specialist at Kirtland, said that Bishop filed an EEO complaint which led to a March 17, 1994, discussion by Valenzuela with Bishop. VI R. at 82-83. The specifics of Bishop's complaint against McCarthy-Brow were not described in the record, but McCarthy-Brow testified that Bishop had asked her if she was aware he had filed a "sexual harassment complaint" against her. V R. at 25.

McCarthy-Brow testified that she received a second note from Bishop telling her that he had filed the EEO complaint, and she again gave a copy of the note to Major Chernek. McCarthy-Brow told Chernek that Bishop "really scared" her because he was not rational. Then, on March 24, McCarthy-Brow was in the office of a co-worker when Bishop came in and asked her if she was aware of the EEO complaint. McCarthy-Brow described Bishop as being very angry at that time, so angry that he was red in the face.

After McCarthy-Brow showed Chernek Bishop's second note, regarding Bishop's

having filed an EEO complaint against McCarthy-Brow, Chernek asked one of his top sergeants to take a look at the problem because Chernek felt that issues had "escalated." Id. at 46-47. Then, when Chernek was told of Bishop's March 24 outburst in the presence of McCarthy-Brow and another worker, he decided to physically separate Bishop and McCarthy-Brow into separate buildings. Id. at 47. He asked his second in command to move Bishop into another building which was about two football fields in distance away. Id. at 47-48.

Mr. Valenzuela was called by the prosecution and testified that he was employed at Kirtland Air Force Base. At the time of trial in December 1996, he had been an affirmative employment specialist there for some nine months. VI R. at 81-82. Previously, he had been an EEO specialist at Kirtland for about three years. Valenzuela was assigned the EEO complaint which Bishop filed against McCarthy-Brow, and about March 17, 1994, Valenzuela had contact with Bishop about the complaint. Valenzuela determined that for him to evaluate Bishop's complaint, he needed to talk to Major Chernek, supervisor of the unit; to Marlee Mulnix, who was administratively assigned to supervise Bishop; and to Ms. McCarthy-Brow. From his interviews with these persons, Valenzuela could find no confirmation of any allegations made in Bishop's complaint against Ms. McCarthy-Brow. Id. at 83.

On April 8, 1994 (the day of the auto collision), Valenzuela scheduled a meeting in his office with Bishop at 1:30 p.m. Valenzuela explained to Bishop the results of his

interviews with the three individuals and that they did not seem to indicate any truth to Bishop's allegations. Id. at 84-85. At this point, Valenzuela was looking down at his notes and heard a loud bang. Evidently Bishop had hit the table with his fist. Valenzuela looked up and Bishop was standing "by the side of the table, breathing real hard, and his face was real red, and obviously [he was] very angry." Id. at 85. He still had his hand clinched and he kept saying "they are lying, they are lying." Id. Valenzuela's supervisor, whose office was next door, opened the door and Valenzuela told her everything was all right. Valenzuela continued the interview with Bishop, and then told Bishop he had "not achieved remedy." Id. at 86.

Valenzuela told his supervisor that because of what had happened in his office, he was concerned that there was a possibility that Bishop "might hurt somebody." Id. at 86-87. Valenzuela called Major Chernek and advised him that Valenzuela thought Chernek "might take some precautions." He also called the employee labor relations specialist and explained the situation to her. Valenzuela cautioned Major Chernek that he was concerned, based on what he saw Bishop do in his office, "that he was quite capable of hurting somebody." Id. at 87. Valenzuela also said that Bishop had requested a reassignment, a transfer out of the Phillips Laboratory. Major Chernek told Valenzuela he could reassign Bishop within the lab to a different location. During his cross-examination, Valenzuela said that Bishop had not calmed down when Valenzuela's supervisor came to the door, but he wasn't threatening and was "totally compliant . . . ." Id. at 95-96. Bishop peaceably left Valenzuela's office.

- 5 -

Valenzuela also said he had never seen anyone as angry as Bishop was.  Id. at 99.

In response to the concerns that Valenzuela had expressed, Chernek asked McCarthy-Brow to leave early, apparently out of concern that Bishop might try to confront her while he was still upset about the outcome of the EEO matter.  As McCarthy-Brow was leaving the base to avoid Bishop, he saw her and collided with her.

McCarthy-Brow testified that as she was driving north on Carlisle Avenue towards the exit of the base she saw Bishop coming toward her from the opposite direction in his red pickup truck.  The street was an undivided four-lane roadway.  Both Bishop and McCarthy-Brow were in the outside lane of their respective sides of the street.  McCarthy-Brow testified that Bishop suddenly swerved across the two vacant lanes and directly into the side of her car.  The impact forced her car onto the curb.  Shaken up and afraid of what Bishop might do next, McCarthy-Brow drove forward to the "guard shack" at the base gate rather than remaining at the scene of the collision.  (Our record does not disclose how far from the gate the collision occurred; we do know from the testimony that the gate was within sight from that point.)  McCarthy-Brow was taken to a local hospital but had no serious injuries.

The prosecution called Colonel Douglas Smith, who was assigned to the Albuquerque base at the time of the incident.  At approximately 2:30 p.m. on April 8, 1994, he was leaving the Phillips Lab to cross the street to another building and was crossing Carlisle at that time.  VI R. at 101-02.  While at the intersection, he saw an accident involving a small, red Chevy truck and a gray car.  Smith said he noticed the red vehicle coming southbound.  A peculiar

thing was that it veered from its direction, making one specific move and veering three lanes over and into the gray car. Id. at 103. Immediately after the collision, the gray car sped off to the guard gate. The occupant of the red vehicle got out and walked over and sat on the curb. Id. at 103. It seemed peculiar about the car leaving the accident, but he saw that the car stopped at the guard gate.

When the person in the red truck got out, Smith ran over because he thought that person was injured. Smith asked the driver if he was "okay," and he mumbled that he was. Smith observed that "[h]e was mad, he was angry, dejected, despondent, all those things characterized together." Id. at 104. The driver of the Chevy did not tell Smith that he had lost control of his car or blacked out.

On cross-examination, Colonel Smith conceded that when he was asked by an insurance company representative whether the driver of the Chevy might have lost control, Smith replied: "He might have, I don't know." Id. at 108. Smith also said he told the insurance company representative that the driver might have frozen at the wheel. Id. It was "peculiar because it was one definite move," which Smith said he knew for a fact. Id. Smith said that the driver of the red pickup did not jump up and down and kick (as McCarthy-Brow had testified); Bishop just got out and sat down on the curb. Id. at 109. Smith also said that the pickup driver was angry or mad but he did not know whether that driver was upset because his vehicle was damaged. Id. at 114-15.

The prosecution called Mr. Andrew Linegar. He was stationed at Kirtland as a law

enforcement specialist earlier, at the time of this collision. His duties were similar to those of a civilian police officer and included automobile accident investigations. He had training for this work at Lackland Air Force Base in Texas in January and February 1994. Linegar was called concerning an automobile collision and immediately responded that afternoon to the scene. He saw the defendant's vehicle and also Ms. McCarthy-Brow's vehicle down at the Carlisle gate. VI R. at 155. Linegar's report was basically what he saw, the lack of skid marks by either vehicle and the "yaw marks" which he said are caused by a vehicle sliding or being forced in a lateral direction. Linegar made no speed computations because the lack of skid marks kept him from doing that. He conducted a tire examination by looking for slits, cracks, bubbles, punctures, tears or any abnormality in the tires that would have indicated that the left front tire of the pickup had burst or exploded before impact. He found no such abnormalities. Id. at 158. From his visual inspection Linegar did not detect any internal damage to the tire, but it was not removed from the vehicle or separated from the rim for examination. Such an examination costs money and funds weren't available because of tight budget constraints, Linegar explained. Id. at 159. Nevertheless, from his observations Linegar did not believe there was any internal damage that would cause the tire to go flat. He found no such conditions. Id. at 159-60.

Linegar said several witnesses were interviewed at the scene as well as Ms. McCarthy-Brow. The investigating officers checked the "operational factors," which were the driver's preparation, strategy or method of operating the vehicle, and any evasive

action taken by the driver of the pickup. This would include swerving, veering, or slamming on the brakes, but there was no evidence of such evasive action. Id. at 161. Linegar also said there was no indication that Ms. McCarthy-Brow's actions contributed to the accident. She was not under the influence of anything.

"Conditional factors" were also considered by Linegar, which include the operator of the vehicle, conditions of the roadway, and conditions of the vehicle operated by a driver. The Chevy truck was not mechanically inspected due to lack of funding. Id. at 162. Photographs that had been taken at the time of the accident had been destroyed according to procedure for keeping such things for two years. Id. at 163. Linegar said there was debris after the collision which he saw – headlight and turn signal glass scattered in about an 8'x8' square area in front of the wheels of Bishop's vehicle. Linegar also saw a bent and twisted left front bumper and a scraped left front quarter panel that runs directly above the tire. Id. at 166. Exhibits showed that the McCarthy-Brow vehicle had a dented and scraped left front quarter panel, complete with red paint transfers. Id. at 166.

Linegar was asked what he concluded had happened to cause the incident, based on his training and experience. He said it was "very unusual." There was no physical evidence to indicate what happened there on the scene and there were no skid marks to indicate a vehicle had skidded or that control had been lost. Linegar's conclusion, based on facts learned from interviewing the victim and learning the past history, was that this was an intentional act and that the defendant intentionally drove his car across "all of those lanes of

traffic and intentionally crashed or rammed his vehicle into the victim." Id. at 168-69.

Linegar conceded on cross-examination that in his report he said it could not be determined if the mechanical condition of Bishop's vehicle contributed to the accident because the vehicle was not examined by a mechanic. Linegar's report said no speed computations were made due to lack of skid marks and he was not going to base such estimates on someone else's visual assessment on speed. Id. at 173-74. If he was going to make speed estimates, they were going to be based on physical evidence and mathematical formulas. Id. at 175. Linegar said speed was not a factor here because from his initial review of the scene, he had no reason to believe or suspect there was any speeding involved by either driver. Linegar also said he could not determine whether Bishop took any evasive action because he was not able to talk to Bishop.

Another law enforcement specialist, Blevins, was called by the prosecution. He had investigated at least 100 traffic accidents. VI R. at 119. He had training for this work. He was dispatched to this accident at Aberdeen and Carlisle on April 8, 1994. A red Chevy pickup was there and the second vehicle had been driven to the Carlisle gate. Blevins called for Linegar's assistance because of his good vehicle accident training. Id. at 121.

From a diagram he had made, Blevins testified that as Bishop approached Ms. McCarthy-Brow's car, Bishop veered across the double lane of traffic and struck McCarthy-Brow's car while she was "up against the right-hand lane." VI R. at 122. Bishop struck her vehicle with "enough force to force her car up onto the curb and gouge out a gash

into the concrete roadway with her, I believe it was her front right tire." Id. Blevins said from his tire examination of both vehicles, he didn't observe any damage or a blowout or puncture on any vehicle. Blevins got into the cab of the truck, grabbed the steering wheel and depressed the brake pedal but everything "appeared normal." Id. Based on his investigation, Blevins concluded the accident was "somewhat confusing, [he] couldn't quite understand what had caused the vehicle . . . to come over and strike her vehicle when she was on the far side of the roadway. After taking everything into consideration [Blevins] was leaning towards the possibility of a vehicular assault or something of that nature." Id. at 125.

On cross, Blevins said he never arranged for anyone with expertise to inspect the Chevy for any kind of steering damage or problems. Id. at 126. He said its left front tire "was flat from the impact." Id. at 129. From the drawings, Blevins said Bishop struck McCarthy-Brow in the side. Id. at 131.

As we explain below, our review of the sufficiency of the evidence to support the conviction is limited to the evidence presented in the prosecution's case-in-chief.[2] However, in order to provide a more complete background we will review the most significant testimony presented in the defense case and the government's rebuttal. Bishop did not testify. Among the defense witnesses called was Sgt. Thomas Johnson, a witness to the collision. Johnson had been driving on Carlisle Avenue at the time, and his car was behind Bishop's pickup. VII R. at 249. Johnson testified that he was driving about 25 miles

---

[2]See part III, *infra*.

per hour and that Bishop's speed must have been about the same. He said that Bishop appeared to accelerate as his car veered across the road just before the impact with another vehicle. He did not see Bishop do anything to avoid colliding with the other vehicle. Id. at 258-59. Johnson approached Bishop immediately after the accident to see if he needed assistance. Johnson testified that Bishop asked him what had happened Id. at 254. Johnson admitted that he had written in his statement that Bishop did not seem to be speeding. Id. at 254.

Bishop's father, Roger Bishop, testified for the defense. He was retired from the Air Force and had been a professional mechanic. VI R. at 214. He was called by his son the day of the accident and came to Albuquerque. He put a tow bar and a spare tire on his son's truck and towed it back to Clovis, New Mexico. Id. at 213. He evaluated what he would have to buy and what parts needed replacement and determined he could straighten out the bumper but would have to buy a fender, a light, and a parking light. Id. at 216. He replaced the fender. He found the upper control arm bushings were bad on the right side of the vehicle. They control alignment of the wheels and had effect on the steering. Id. at 219.

Roger replaced the tire on the left front and then replaced the other front one to make a matched set. Id. at 220. He said there was some internal failure with one of the tires, and agreed, on cross-examination, that the tire was flattened as a result of the collision and that there was no blow out of that tire. Id. at 223. He also said there were no problems with the brakes. During cross-examination, he opined that one reason for the collision was the

- 12 -

defective right upper arm bushing in conjunction with the left front tire. Id. at 225. On cross-examination Roger later said it was true the tire was flattened as a result of the collision. However, he added that it was the internal problem with the left front tire and right arm bushing that caused the collision, which was his layman's opinion. Id. at 226. During redirect, he said that since the upper control arm bushing was missing and apparently the left tire had some internal wheel problems, that would affect the ability to steer the vehicle. Id. at 229.

In rebuttal the government called George Saylor, a manager at the Clovis Big O Tires store of Clovis. VII R. at 287. Clovis is 240 miles from Albuquerque. Saylor had worked for 25 years in the automotive business and had worked in different Albuquerque garages. He worked on cars that came in by attending to all problems -- engines, ignitions, seats, etc. Id. at 288. He had had schools, classes and seminars on automotive problems. He does have knowledge of brake suspension and front end difficulties. Id. at 290.

According to the Big O invoice, they replaced the upper control arm bushings on the right side of the Bishop vehicle, put on two tires, and did a wheel alignment. When the right upper control arm bushings are worn, it does not have a large impact on the ability to steer the vehicle. Id. at 295. The vehicle could develop some handling problem, but one would still be able to steer the vehicle. Those difficulties would not have an effect on one's ability to operate the brakes, and you are still able to steer to the right or left. Id. at 295-96. Most drivers compensate for such a bushing problem by slightly steering right or left. If a right

- 13 -

upper control bushing were missing, it was not likely that the vehicle would suddenly veer to the left or right. Id. at 297. If missing or badly worn upper control arm bushings are allowed to continue for a prolonged period of time, there could be a catastrophic failure, such as the tire falling over or off the vehicle. Id. at 297.

The speed of a vehicle can impact the amount of such a catastrophic failure. Id. at 299. If there were a combination of an upper control arm bushing being missing, and there being sidewall separation in one or more tires, it was possible there could be a significant effect on the steering of the vehicle and this could possibly cause an accident. Id. at 304. Saylor said that if there is sidewall damage to a tire, that could be caused by colliding with another car. Id. at 304. Such sidewall damage would not impact one's ability to operate their brakes, and the vehicle could still be stopped. Id. at 304-05. Saylor said that towing a vehicle in the manner shown on a photo exhibit requires that the vehicle suspension system be operating normally, and in order to tow a car 240 miles (the distance to Clovis), the suspension would have to be operating normally. Id. at 306. Saylor said he had, however, never examined the pickup. Saylor testified that a slight problem with a suspension system could prohibit the vehicle from being towed, one that caused it to pull hard to one direction or the other. If the vehicle was experiencing such problems of pulling in one direction or the other, it would be difficult to tow it in the manner used to go to Clovis. Id. at 311.

**B**

One of the officers who investigated the incident issued a citation to Bishop for failure

to drive on the right side of the road. The citation charged a violation of section 66-7-308A of the New Mexico Statutes, as applicable on the grounds of Kirtland Air Force Base by the provisions of 18 U.S.C. § 13, the Assimilative Crimes Statute. Some ten months after the April 8, 1994, collision involved here, Bishop entered a plea of no contest to the improper driving citation before a United States Magistrate Judge and was fined fifteen dollars for the violation, plus a special assessment of five dollars.

Bishop was indicted on the instant assault charge on August 2, 1995. While in custody awaiting trial, Bishop filed a pro se habeas corpus petition contending that his indictment on the assault charge violated the Double Jeopardy Clause of the Fifth Amendment. The habeas petition was assigned to a magistrate judge for a report and recommendation. The magistrate judge concluded that the assault prosecution did not violate the Double Jeopardy Clause and recommended that the petition be dismissed. The district judge, who was the same judge to whom the instant prosecution had been assigned, adopted the magistrate judge's recommendation and dismissed the habeas petition. Subsequently, the judge permitted the filings in the habeas proceeding to be admitted into the record in this assault proceeding and heard some additional argument by counsel on the double jeopardy issue. The judge again concluded that the instant prosecution did not constitute double jeopardy in violation of the Fifth Amendment.

## II

We consider first Bishop's argument that this prosecution violated his rights under the

Double Jeopardy Clause of the Fifth Amendment. We turn our analysis on this issue to Blockburger v. United States, 284 U.S. 299 (1932), which the Supreme Court reaffirmed in United States v. Dixon, 509 U.S. 688, 696 (1993). Under the Blockburger analysis, we ask "whether each offense contains an element not contained in the other; if not, they are the 'same offence' and double jeopardy bars additional punishment and successive prosecution." Dixon, 509 U.S. at 696.

As did the district judge, we agree with the analysis of the magistrate judge who first considered this issue in making his recommendation to dismiss Bishop's pro se habeas petition. The magistrate judge determined that the elements of the traffic offense of failing to drive on the right side of the road under New Mexico law are simply that the roadway was of sufficient width for the driver to stay entirely on its right half and that the driver failed to do so (absent any of the statutory exceptions under which it is permissible to drive on the left side). On the other hand, the federal assault charge has three elements: an assault, with a dangerous weapon, and with the intent to do bodily harm to another. It is apparent that each offense requires proof of an element that the other offense does not. Accordingly, under the Blockburger test the instant prosecution was not barred by the former conviction.

Defendant's efforts to avoid this analysis are not persuasive. In the briefs counsel seems to argue that this prosecution should have been barred because the first offense is a

lesser included offense of the second.[3]  At oral argument, however, counsel conceded that Bishop's traffic infraction is not a lesser included offense of the present charge in the "traditional" sense of Blockburger.  Suffice it to say that we agree that failing to drive on the right side of the road is not a lesser included offense of the crime of assault with a dangerous weapon with intent to do bodily harm.

Counsel nevertheless repeatedly referred at argument to the fact that in the particular circumstances of this case, the government did in fact seek to prove that the assault was committed by driving the vehicle on the wrong side of the road, the "same conduct" for which Bishop had already been convicted.  Bishop relies primarily on two cases,   United States v. 9844 S. Titan Court, 75 F.3d 1470 (10th Cir. 1996), and Illinois v. Vitale, 447 U.S. 410 (1980).  For purposes of double jeopardy analysis the underlying facts of this case and those of Vitale are very similar, even though the facts of the latter were much more tragic.  In Vitale, the defendant was the driver of a car which struck and killed two children.  At the scene, Vitale was given a citation for failure to reduce speed to avoid an accident.  After he had been convicted of that charge, the state initiated proceedings to charge him with

---

[3]When one of two prosecutions being analyzed under Blockburger is a lesser included offense of the other, double jeopardy protections apply.  In such a situation, the greater offense will require proof of an additional element, but the lesser offense by definition does not require any element not necessary to establish the greater.  As a result, former conviction of the lesser crime will bar prosecution of the greater crime; separate prosecutions are not permissible under Blockburger because it is not the case that *each* crime contains an element not contained in the other.  See Brown v. Ohio, 432 U.S. 161 (1977).

involuntary manslaughter.[4]  The Illinois Supreme Court held that the second prosecution would violate the Double Jeopardy Clause of the federal constitution, as applicable to the state through the Fourteenth Amendment.

The Supreme Court vacated the judgment of the state high court and remanded for further proceedings.  The Court stated that the decision was certainly correct "[i]f, as a matter of Illinois law, a careless failure to slow is always a necessary element of manslaughter by automobile . . . ."  447 U.S. 419.  The Court further observed, in the passage relied on here by Bishop, that:

> In any event, it may be that to sustain its manslaughter case the State may find it necessary to prove a failure to slow or to rely on conduct necessarily involving such a failure; it may concede as much prior to trial.  In that case, because Vitale has already been convicted for conduct that is a necessary element of the more serious crime for which he has been charged, his claim of double jeopardy would be substantial under Brown [v. Ohio, 432 U.S. 161 (1977)] and our later decision in Harris v. Oklahoma, 433 U.S. 682 (1977).

Id. at 420.  Bishop now argues that his prosecution for assault is barred under the theory expressed in this portion of Vitale.

Bishop's reliance on Vitale is misplaced, however.  Whatever the Court might have intended to convey in the language about Vitale's claim being "substantial" if based on the same conduct as the infraction of failure to reduce speed, we think it clear that this portion of the opinion was abrogated by United States v. Dixon, 509 U.S. 688 (1993).  In Dixon, the

_____

[4]Because he was a juvenile, the form of the proceedings under state law was a petition for adjudication of wardship, but the Court noted that the Double Jeopardy Clause applied to the juvenile proceedings Vitale faced.  447 U.S. at 415.

Court expressly overruled the "same conduct" test of Grady v. Corbin, 495 U.S. 508 (1990). In Grady the Court had gone beyond the above quoted statement from Vitale. Where in Vitale the Court had merely stated that a second prosecution in which the government relied on the same conduct as that proven in establishing a prior conviction would raise a substantial issue, in Grady the Court held that such a second prosecution would indeed violate the Double Jeopardy Clause. That rule was short lived, however, and in Dixon the Court expressly rejected it and reaffirmed the Blockburger test as the controlling standard. This development in the Supreme Court's double jeopardy jurisprudence is fatal to Bishop's contention here. The focus of the Blockburger test is not, as defendant would have it, on the evidence the prosecution relies on to prove the elements of the offenses but on the elements themselves.

As to Titan Court,[5] Bishop relies mainly on this court's statement, 78 F.3d at 1489, that

> [w]hen only one offense contains an 'extra' element not found in the other, the latter is a lesser included offense of the former, and a defendant may not be charged with both in separate proceedings. See Illinois v. Vitale, 447 U.S. 410, 421 . . . .

Appellant's Brief-in-Chief at 8. We are convinced, however, that Dixon's reaffirmation of the Blockburger test after Vitale suffices to show that Bishop's position here on the double

_____

[5]We note that the ultimate holding of Titan Court – that forfeitures of some of the properties at issue there violated the double jeopardy rights of the owner – was effectively abrogated by United States v. Ursery, 518 U.S. 267 (1996), which held that in rem civil forfeitures generally are not punishments for purposes of the Double Jeopardy Clause.

jeopardy issue is untenable.

### III

Bishop's second major contention is that the evidence that he intentionally assaulted Ms. McCarthy-Brow was insufficient as a matter of law to support the conviction. (As Bishop notes, this was essentially the only contested factual issue at trial.) Our standard of review for claims of insufficiency of the evidence is well established and is the same standard the district court is to apply in ruling on a motion for acquittal in the first instance. United States v. Valadez-Gallegos, 162 F.3d 1256, 1262 (10th Cir. 1998). The test is whether, viewing the evidence and all reasonable inferences therefrom in the light most favorable to the government, there is substantial evidence from which a reasonable jury might find the accused guilty beyond a reasonable doubt. Id. However, inferences must be reasonable. "'An inference is reasonable only if the conclusion flows from logical and probabilistic reasoning.'" Id. (quoting United States v. Jones, 44 F.3d 860, 865 (10th Cir. 1995)). Finally, because the defense moved for a judgment of acquittal at the close of the prosecution's case, and the trial judge deferred ruling on the motion until after the verdict, we must consider only the evidence presented in the government's case-in-chief. Fed. R. Crim. P. 29(b).[6]

---

[6]See advisory committee notes to the 1994 amendment to Rule 29. The concluding sentence of Rule 29(b) now provides: "If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved." The final sentence of the advisory committee notes states: "And in reviewing a trial court's ruling, the appellate court would be similarly limited."

We conclude that the evidence was sufficient. Bishop had displayed intense anger centered on Ms. McCarthy-Brow, and the incident Valenzuela related occurred about an hour before the collision. Smith, a witness to the collision, described defendant's vehicle as having made a sudden and definite change of course into McCarthy-Brow's car. Bishop contends that the jury was left to speculate on the mechanical condition of his pickup. However, although there was not an exhaustive mechanical examination of the pickup, there was evidence that it did not malfunction. The cursory examination by one of the investigating officers indicated no problem with the steering or the brakes, and both officers examined the tires without finding any damage that could have caused a drastic loss of control. We think the jury could draw a reasonable inference of intent for the assault from the evidence that Bishop made no apparent effort to avoid the collision, such as applying his brakes. Both investigating officers were surprised by the lack of skid marks. The officers suggested that Bishop intentionally caused the impact.

Bishop argues that the evidence of his anger was insubstantial because there was evidence that he calmed down after his initial outburst. We conclude that the jury could have reasonably inferred from the evidence that the control Bishop exhibited after his outburst in the office of Mr. Valenzuela was not disproof of his anger but of a temporary calm while he was in a structured situation, inhibited by the presence of Valenzuela and by the supervisor's appearance. Bishop is critical of the prosecution's reliance on evidence that McCarthy-Brow was frightened by him. While this evidence was not alone sufficient to establish intent, we

- 21 -

see no error in allowing the jury to consider it. The jurors were, of course, able to see and judge for themselves the credibility of the victim and to infer, if they chose to, that her fear was based on the hostility that Bishop had demonstrated in the past toward her.

In sum, considering the evidence as a whole, we are convinced that the jury's conclusion that Bishop committed an assault by intentionally causing the collision is a permissible one.

**IV**

Bishop attempts to raise two new issues in his reply brief. His counsel acknowledges our general rule that it is improper to raise an issue on appeal for the first time in the reply brief. However, counsel for Bishop contends that these two issues, "although not directly raised in appellant's brief in chief, are related to the double jeopardy argument and . . . Mr. Bishop has specifically requested that the undersigned present [them] to this Court as grounds for having [appellant's] conviction vacated." Appellant's Reply Brief at 7.

Bishop contends in one of these propositions that his prosecution should have been barred by collateral estoppel. He posits that his plea of no contest to the traffic violation of driving on the wrong side of the road is equivalent to an adjudication of negligence, and from this he argues that the government should be estopped from proving that his mental state was one of intent to assault. Defendant cites Paddock v. Schuelke, 473 P.2d 373 (N.M. Ct. App. 1970), as authority that "the scienter element of failure to keep right of center is negligence." Appellant's Reply Brief at 8. We disagree with this characterization. What Paddock holds

is that for purposes of civil liability, failure to keep right of center without excuse or justification is negligence as a matter of law.  Id. at 379.

This argument is a non sequitur.  Even if we accept the premise that a plea of no contest is somehow equivalent to an adjudication of negligence – indeed, even if there had been an actual adjudication of negligence – we do not believe that such a finding is necessarily also a finding of no culpability greater than negligence.  The government simply was not required to establish a more culpable state of mind – and would not have been, even had Bishop contested the matter by pleading not guilty – in order to establish the traffic violation.  Consequently, the conviction on the traffic offense does not involve any actual finding that defendant's culpability was negligence *but not more than negligence*, which we believe would be the necessary predicate for this argument.

The second new issue in the reply brief is that failure to bring both of these prosecutions arising from the same incident in a single proceeding violated a "general policy" of the federal government, a policy noted by the government in Petite v. United States, 361 U.S. 529, 530 (1960).  We have previously held that any such policy confers no right on any accused but is merely a policy for guidance of federal prosecutors.    United States v. Thompson, 579 F.2d 1184, 1189 (10th Cir. 1978)(en banc).  **AFFIRMED.**

Entered for the Court

William J. Holloway, Jr.
Circuit Judge
