**F I L E D**
United States Court of Appeals
Tenth Circuit

**DEC 17 1998**

**PATRICK FISHER**
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

DAVID VALADEZ-GALLEGOS,

    Defendant-Appellant.

No. 98-2017

---

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CR-97-84-2-JC)**

---

David N. Williams (John J. Kelly, United States Attorney; Charles L. Barth, Assistant United States Attorney, on the brief), Assistant United States Attorney, Albuquerque, New Mexico, for Plaintiff-Appellee.

Todd B. Hotchkiss of Frechette & Associates, Albuquerque, New Mexico, (Peter J. Giovannini, Las Cruces, New Mexico, on the briefs), for Defendant-Appellant.

---

Before **SEYMOUR, PORFILIO** and **BRORBY**, Circuit Judges.

---

**BRORBY**, Circuit Judge.

---

Defendant-Appellant David Valadez-Gallegos appeals his jury conviction

on one count of violating 21 U.S.C. § 841(d)(2), for knowingly and intentionally possessing a listed chemical knowing or having reasonable cause to believe the listed chemical would be used to manufacture methamphetamine. Mr. Valadez-Gallegos argues (1) insufficient evidence supports the jury verdict and the trial court's denial of his motion for acquittal, and (2) the trial court improperly admitted prejudicial evidence concerning a prior arrest. We exercise jurisdiction under 28 U.S.C. § 1291 and, for the reasons set forth below, reverse on grounds the evidence is insufficient to support Mr. Valadez-Gallegos' conviction.

FACTUAL BACKGROUND

Around midnight on January 17, 1997, New Mexico State Police Officer Urbie Johnston stopped a vehicle after radar showed it going substantially slower than the speed limit, and weaving and straddling the white shoulder line. The vehicle – a late 1980's model white Chevy pickup with a camper shell – contained the driver, Horacio Marquez-Munoz, and a front cab passenger, Mr. Valadez-Gallegos. On request, Mr. Marquez-Munoz produced his license and registration, showing the vehicle registered to Jose Vasquez of Modesto, California. During his conversation with Officer Johnston, Mr. Marquez-Munoz seemed very preoccupied, and displayed a shaky voice and trembling hands. He advised Officer Johnston he was going to Modesto, California.

-2-

While conversing with Mr. Marquez-Munoz, Officer Johnston noticed Mr. Valadez-Gallegos sitting stiffly and straight up, looking straight ahead, and avoiding eye contact. Officer Johnston next questioned Mr. Valadez-Gallegos, who spoke Spanish and some English. Mr. Valadez-Gallegos gritted his teeth and appeared irritated and evasive. He told Officer Johnston he was heading back to Modesto after spending two or three days in El Paso visiting the driver's aunt. He did not know the driver's name. Similarly, the driver told Officer Johnston he did not know Mr. Valadez-Gallegos' name – only his nickname "Guero."

New Mexico State Police Officer Landis Hartranft and United States Border Patrol Agent Steve Rose arrived at the scene while Officer Johnston was questioning Mr. Valadez-Gallegos. Agent Rose assisted in translating. Mr. Valadez-Gallegos reiterated he was heading to Modesto from El Paso, and again explained he: (a) did not know the driver's name, but he had known him for three or four months; (b) did not know who owned the vehicle, but said it belonged to a friend of the driver; and (c) did not know the name of the driver's aunt, but he stayed at her house in El Paso.

Both Mr. Valadez-Gallegos and Mr. Marquez-Munoz granted permission for a search of the truck. Inside the truck's cab, officers found a roll of black,

sticky tape, which Officer Johnston thought uncommon but had seen in some "work trucks." The officers also found a New Mexico state police speeding citation issued two days before to Mr. Marquez-Munoz on Interstate 40, eastbound, near Tucumcari, New Mexico. Officer Johnston noted that Tucumcari is not on a direct route between Modesto, California and El Paso, Texas.

During the search, Officer Johnston lifted the camper door and immediately detected an overwhelming odor of fabric softener. Examination of the camper showed only a sleeping bag, pillow, large blanket, suitcase, and "odds and ends." Officer Johnston next deployed his narcotics dog, Nero, who "reacted" to the camper shell and, when directed inside, stuck his nose to the ceiling and its light. Officer Johnston removed the light and inserted a drill bit, producing a white piece of cloth smelling of fabric softener. Because of the presence of fabric softener, Officer Johnston decided to investigate further. However, because of the severe cold and wind, the officers removed the vehicle and its occupants to a nearby border patrol station for everyone's safety.

On re-examination of the camper, it appeared a hidden compartment existed in the ceiling, with black sticky tape, similar to that previously found in the cab, stuck along the ceiling and seams where the roof and sides meet. The screws also

-4-

appeared to be worn, and removed and replaced several times. On removing the screws and ceiling cover, the officers discovered many one-gallon plastic freezer bags lining the entire width and length of the camper top. The bags contained either a white powdery substance, a rolled-up cookie dough-like substance, or little white pills. They also recovered hundreds of fabric softener sheets over and inside the plastic bags. Tests later revealed the substances in the bags contained varying strengths or percentages of psuedoephenedrine hydrochloride – referred to as "ephedrine." Ephedrine is used to manufacture methamphetamine, perfume, or over-the-counter drugs. Drug Enforcement Administration agents found no latent fingerprints on the bags.

Further inspection of the cab revealed a road map of the United States marked with annotations for time and distances between locations, and a lipstick smudge. Although no annotation appeared near El Paso, some of the circled locations on the map included Needles, California; Tucumcari, New Mexico; and Amarillo, Texas – all high narcotic interdiction areas. The cab contained no guns, knives, beepers, cell phones, or large amounts of cash – items commonly associated with drug trafficking. The cab emitted no odor of fabric softener sheets, and until removal of the camper ceiling, they emitted no odor outside the shell.

After completing their search and field testing the substances, the officers arrested Mr. Marquez-Munoz and Mr. Valadez-Gallegos for possession of controlled substances. Mr. Gonzalo Cordova, coordinator for the Southwestern New Mexico Narcotics Task Force, interviewed Mr. Valadez-Gallegos in Spanish while in custody. Mr. Valadez-Gallegos repeated he lived in Modesto, California, and met the driver only four or five months before in a Modesto bar, knowing him only by his nickname, "El Flaco." Mr. Valadez-Gallegos told Officer Cordova that Mr. Marquez-Munoz invited him to go along while Mr. Marquez-Munoz transported his aunt to El Paso. They left Modesto on Tuesday, arriving in El Paso on Thursday.

Mr. Valadez-Gallegos acknowledged he and Mr. Marquez-Munoz received the traffic citation near Tucumcari but said they drove a northern route because of bad weather to the south. However, the officers noted the weather to the south had been no worse than that in the northern part of the state. When Agent Cordova questioned Mr. Valadez-Gallegos about the $200 the officers seized from him, Mr. Valadez-Gallegos explained he left California with $600, but in the two days of travel, spent $400 on gas and food.

Mr. Valadez-Gallegos said they made no significant stops nor did any sight-

seeing along the way, other than staying at Mr. Marquez-Munoz's aunt's house in El Paso on Thursday and Friday, where he spent most of the time sleeping. During this time, he had no knowledge of the vehicle leaving the residence, but could not explain how the contraband got in the camper.

According to Mr. Valadez-Gallegos, the aunt traveled in the camper. However, the camper contained no women's clothing or articles. When advised the speeding citation showed no other person accompanied them, Mr. Valadez-Gallegos recanted, stating Mr. Marquez-Munoz told him to say the aunt traveled with them to El Paso. Later, on being told of Mr. Valadez-Gallegos' statement, Mr. Marquez-Munoz appeared angry, denied he gave those instructions, and wanted to confront Mr. Valadez-Gallegos.

The next interview occurred at the task force headquarters in Deming, New Mexico. While Drug Enforcement Administration Agent Luis Medina took biographical information from Mr. Valadez-Gallegos and Mr. Marquez-Munoz, Agent Richard Sanders advised them that some of the substance field tested positive for heroin. On hearing this, Mr. Marquez-Munoz immediately turned to Mr. Valadez-Gallegos and, in Spanish, stated "I didn't know this was heroin." Mr. Valadez-Gallegos did not reply.

After receiving a Miranda warning in Spanish, Mr. Valadez-Gallegos agreed to a third interview, conducted in Spanish by Agents Medina, Sanders and Cordova. Mr. Valadez-Gallegos repeated he met Mr. Marquez-Munoz at a bar in California only four or five months before. He accompanied Mr. Marquez-Munoz because he had never visited the area and felt it a good time to go. This time, instead of leaving Modesto on Tuesday, he said they left on Wednesday at 4:00 p.m., drove all night, and arrived in El Paso on Thursday. Instead of staying at the aunt's as he previously stated, he said they stayed in a mobile home in central El Paso, but he received no introduction to its occupants. According to Mr. Valadez-Gallegos, they did not bring Mr. Marquez-Munoz's aunt to El Paso because she changed her mind and decided not to make the trip. Mr. Valadez-Gallegos said they left El Paso on Friday, heading west on I-10.

Agent Cordova also interviewed the driver, Mr. Marquez-Munoz, whose story varied substantially from Mr. Valadez-Gallegos'. Mr. Marquez-Munoz indicated they drove the northern route to El Paso because he did not know the road – not due to bad weather. They traveled to El Paso, not to transport his aunt but to look for her. Since they could not find her, they stayed overnight at a rest stop in El Paso.

On February 4, 1997, Agent Medina conducted a fourth interview with Mr. Valadez-Gallegos, who wanted to provide information to assist in the investigation. Mr. Valadez-Gallegos again changed his story, saying they made four stops during the trip from Modesto to El Paso and stayed at a truck stop in El Paso, not a trailer. He did not know the truck stop's location. Because they could not find the aunt's residence in El Paso, they headed back towards Modesto. When specifically asked, Mr. Valadez-Gallegos gave no indication that he knew the ephedrine's final destination. When asked whether there were other people involved, Mr. Valadez-Gallegos indicated there were, but he stated he did not know their names. He said the pickup never left his sight during the trip but he failed to respond when asked how the ephedrine got in the camper.

At trial, Officer Johnston testified that during the entire stop and search, Mr. Marquez-Munoz showed signs of extreme nervousness, including vomiting several times, shaky legs, acting antsy and not sitting still, defecating, urinating at least two times, and lighting up several cigarettes. Mr. Valadez-Gallegos, however, showed no signs of nervous behavior. He also testified Mr. Valadez-Gallegos sat the same way during the trial as he sat the night of the arrest – stiffly and straight up, avoiding eye contact – which Officer Johnston admitted may be normal for him. Although Mr. Valadez-Gallegos gritted his teeth and appeared

irritated and evasive during his initial interview, Officer Johnston acknowledged this behavior or appearance may have resulted from Officer Johnston's limited ability to speak Spanish. He testified it is not unusual for vacationers to carry a road map in the vehicle with markings, including mileage and time scheduling. Officers Johnston and Hartranft also testified that nothing in the vehicle, nor their investigation, directly connected Mr. Valadez-Gallegos to the ephedrine found in the truck.

PROCEDURAL BACKGROUND

Prior to trial, the government filed a notice of crimes, wrongs or acts, pursuant to Fed. R. Evid. 404(b), indicating its intent to use evidence of Mr. Valadez-Gallegos' prior Oklahoma arrest,[1] five months earlier, for possession of pseudoephedrine to show his knowledge and intent. When arrested in Oklahoma, Mr. Valadez-Gallegos was a passenger in another vehicle containing ephedrine. Mr. Valadez-Gallegos filed a motion in limine in opposition. The court ruled the evidence could not "be offered in the case in chief unless the defense develops a theory and paints a picture that Mr. Valadez knows nothing about psuedoephedrine and has no idea what that is."

---

[1] Although arrested, Mr. Valadez-Gallegos was never prosecuted.

-10-

At trial, the prosecutor attempted to introduce evidence of the prior arrest by asking Agent Medina whether Mr. Valadez-Gallegos told him "about being stopped previously for suspected cocaine."

A. No, sir, he did not.

Q. Did he tell you what Mr. Villa Senor had stated about that stop?

A. Yes, sir.

Q. And was it cocaine?

Before the witness answered, the trial court interrupted and requested a bench conference. The prosecutor asked the court to permit the testimony because of its similarity to the present arrest, and offered the evidence as a "statement against interest" because the defense, through cross-examination of witnesses, was attempting to show nothing connected Mr. Valadez-Gallegos with the drugs found in the vehicle. Defense counsel objected, claimed the testimony "tainted" the jury, and requested a mistrial. The trial court denied the motion for a mistrial, ruled the witness could not be asked any more questions concerning the prior arrest, and allowed the prosecution to reserve such questioning for its last two witnesses. The judge then instructed the jury to disregard the questions and answers relating to Mr. Villa Senor.

Prior to calling its last two witnesses, the prosecution again requested

permission to present Rule 404(b) testimony on Mr. Valadez-Gallegos' prior arrest, to show "knowledge, intent, and ... pattern." Defense counsel objected to the proposed evidence as extremely and unduly prejudicial. A lengthy colloquy ensued, after which the trial court granted the prosecution's request but limited the evidence to discussion of a stop, not an "arrest"; where the stop occurred; the origin and route of the trip; and the fact "a large quantity of psuedoephedrine was found with Mr. Valadez-Gallegos being a passenger in the vehicle." The trial court gave the jury a cautioning instruction prior to any further testimony being presented.

The prosecution then called Oklahoma Highway Patrolman Mark Nelson, who testified that on August 15, 1996, he stopped a blue Dodge pickup truck, traveling from Dallas, Texas, to Modesto, California, and containing the driver, Samuel Villa Senor, and a passenger, Mr. Valadez-Gallegos. Officer Nelson smelled an odor similar to fabric softener sheets, but called for assistance due to his inability to speak Spanish.

Oklahoma Bureau of Narcotics Agent Frank Maldonado then testified he spoke in Spanish with Mr. Valadez-Gallegos, who was traveling from Modesto to Dallas and then to Houston, on vacation. Mr. Valadez-Gallegos told Agent

Maldonado that he and Mr. Villa Senor slept in a motel in Dallas one night and a motel in Houston the next night, where he swam in the pool. He said he and Mr. Villa Senor borrowed the truck for the trip. When the officers removed certain "objects" from the vehicle, Mr. Valadez-Gallegos asked if they "were going to make sure of what that was." Neither officer testified that the "objects" removed from the vehicle contained ephedrine. The trial court instructed the jury about the limited "knowledge or intent" purposes of Fed. R. Evid. 404(b) evidence.

At the close of the government's case, Mr. Valadez-Gallegos moved for judgment of acquittal under Fed. R. Crim. P. 29(a), arguing insufficient evidence existed to show the knowledge or intent required to commit the crime charged. The judge deferred a decision on the motion until after the jury rendered a verdict.

The judge provided, in relevant part, the following jury instructions: (1) the government must prove Mr. Valadez-Gallegos guilty beyond a reasonable doubt; (2) the government must prove beyond a reasonable doubt that (a) Mr. Valadez-Gallegos knowingly possessed a listed chemical, (b) the listed chemical was pseudoephedrine, and (c) Mr. Valadez-Gallegos possessed the listed chemical with intent to manufacture methamphetamine, or knowing, or having reasonable

cause to believe, the pseudoephedrine would be used to manufacture methamphetamine; and (3) the law recognizes two kinds of possession – (a) actual possession in which the person knowingly has direct physical control over a thing at a given time, and (b) constructive possession, in which the person, although not in actual possession, knowingly has both the power and intention, at a given time, to exercise dominion or control over a thing either directly or through another person. He also instructed the jury mere presence at the scene of a crime, or knowledge a crime is being committed, is not sufficient to establish the defendant either directed or aided and abetted in the crime.

The jury found Mr. Valadez-Gallegos guilty of one count of violating 21 U.S.C. § 841(d)(2), for possessing a listed chemical knowing and having reasonable cause to believe the listed chemical would be used to manufacture a controlled substance.

The trial court subsequently denied Mr. Valadez-Gallegos' Rule 29 motion for judgment of acquittal.[2] The trial court ruled the government presented

---

[2] Under Fed. R. Crim. P. 29(b), the trial court may reserve a decision on a motion for judgment on acquittal on one or more charges until after the jury returns its verdict. Here, Mr. Valadez-Gallegos sought acquittal of conviction under both 21 U.S.C. § 841(d)(1) and (d)(2), prior to the jury's verdict, and the court reserved its decision. Because the jury convicted Mr. Valadez-Gallegos

adequate evidence from which a reasonable jury could conclude Mr. Valadez-Gallegos committed the crime charged. In addition to the massive quantities of ephedrine found in the camper, the trial court concluded the following evidence established Mr. Valadez-Gallegos' knowledge of the presence of ephedrine: (1) his inherently inconsistent, contradictory, and incredible stories told to various police officers on many occasions and different settings; (2) the annotated road map found in the cab where he was a passenger; (3) the overwhelming and pervasive smell of perfumed dryer sheets within the truck; (4) Mr. Marquez-Munoz's statement to Mr. Valadez-Gallegos that he "didn't know there was heroin;" (5) Mr. Valadez-Gallegos' failure to respond when asked how the ephedrine could have been put in the ceiling of the camper "if he never left the vehicle." At sentencing, Mr. Valadez-Gallegos received seventy-eight months in prison and three years supervised release.

## ANALYSIS

Mr. Valadez-Gallegos argues his conviction should be set aside because (1) insufficient evidence exists to support either the jury verdict or the trial court's

---

only under 21 U.S.C. § 841(d)(2), the trial court considered the motion with respect to that statute only and entered a Judgment of Acquittal on the 21 U.S.C. § 841(d)(1) charge.

denial of his Rule 29 motion for acquittal; and (2) the trial court improperly

admitted Rule 404(b) evidence concerning his prior arrest.

## Sufficiency of the Evidence

Mr. Valadez-Gallegos claims insufficient evidence supports the verdict

because neither his joint occupancy in the vehicle nor his presence and proximity

to the contraband is sufficient to show actual or constructive possession of the

ephedrine. He asserts the government failed to meet its burden of proof since

even knowledge of the presence of ephedrine is insufficient to show the requisite

dominion and control necessary for possession. Finally, he contends his

inconsistent statements and contradictions, and failure to respond to questions on

how the ephedrine got into the camper ceiling, may create a general suspicion but

do not prove he knew of the ephedrine's existence.

Our standard of review on a motion for acquittal is the same as the trial

court's in ruling on the motion in the first instance. *United States v. Miles*, 772

F.2d 613, 615 (10th Cir. 1985). We review the evidence in the light most

favorable to the government and "'then determine whether there is substantial

evidence from which a jury might properly find the accused guilty beyond a

reasonable doubt.'" *Id.* (quoting *United States v. White*, 673 F.2d 299, 301 (10th

Cir. 1982)).  The jury, as fact finder, has discretion to resolve all conflicting testimony, weigh the evidence, and draw inferences from the basic facts to the ultimate facts.  *See United States v. Nieto*, 60 F.3d 1464, 1469 (10th Cir. 1995), *cert. denied*, 516 U.S. 1081 (1996).  However, we may not uphold a conviction obtained by piling inference upon inference.  *United States v. Jones*, 44 F.3d 860, 865 (10th Cir. 1995).  "An inference is reasonable only if the conclusion flows from logical and probabilistic reasoning."  *Id.*  The evidence supporting the conviction must be substantial and do more than raise a suspicion of guilt.  *United States v. Taylor*, 113 F.3d 1136, 1144 (10th Cir. 1997).

In this case, the determinative issue is whether Mr. Valadez-Gallegos constructively possessed the ephedrine.  Generally, a person has constructive possession when he or she knowingly holds ownership, dominion or control over the object and premises where it is found.  *Id.* at 1144-45.  Exclusive possession of the premises supports an inference of constructive possession.  However, joint occupancy of a premises cannot sustain such an inference.  *Id.* (citing *United States v. Mills*, 29 F.3d 545, 549 (10th Cir. 1994)).  To prove constructive possession when there is joint occupancy of a vehicle, the government must present direct or circumstantial evidence to show some connection or nexus individually linking the defendant to the contraband.  *See United States v. Miller,*

-17-

84 F.3d 1244, 1253 (10th Cir.) (relying on *Mills*, 29 F.3d at 549), *cert. denied*, 117 S. Ct. 443 (1996), 118 S. Ct. 419 (1997)). The government must present "'some evidence supporting at least a plausible inference that the defendant had knowledge of and access to the ... contraband.'" *Taylor,* 113 F.3d at 1145 (quoting *United States v. Mergerson*, 4 F.3d 337, 349 (5th Cir. 1993), *cert. denied*, 510 U.S. 1198 (1994)); *see also Mills*, 29 F.3d at 549-50.

On careful review of the record and the trial court's order concerning the motion for acquittal, we conclude the evidence fails to link Mr. Valadez-Gallegos to the narcotics in any way, other than presence and proximity. Presence and proximity are inadequate to support a conviction.

In so holding, we first address the evidence considered by the trial court. As the trial court indicates, Mr. Valadez-Gallegos did make inconsistent and contradictory statements concerning the dates and time of travel, night-time accommodations, weather, and the presence of another passenger on the trip. However, conflicting or inconsistent statements do not always provide evidence sufficient to show knowledge or constructive possession of drugs. *See, e.g., United States v. Leos-Quijada*, 107 F.3d 786, 795 (10th Cir. 1997) (inconsistent stories about travel plans, along with other factors, were not sufficient to connect

defendant with drug venture for purpose of conviction for aiding and abetting in possession of marijuana with intent to distribute); *Jones*, 44 F.3d at 868-69 (citing conspiracy cases in which conflicting or implausible stories did not provide sufficient link to firearms or contraband or show knowledge of an illegal activity). While these cases involve charges of aiding and abetting or conspiracy to possess and distribute drugs, in each, the jury, as in this case, was required to draw inferences from the evidence as to the defendant's knowledge or constructive possession of an illegal drug. Applying the same analysis, we conclude that in this case, Mr. Valadez-Gallegos' conflicting or inconsistent stories merely raise a suspicion or an inference he suspected illegal activity.

The fact "massive quantities" of ephedrine were hidden in the camper ceiling does not directly link Mr. Valadez-Gallegos, a passenger in the cab of the same vehicle, to the contraband. While a pervasive smell of perfumed dryer sheets permeated the camper, the evidence clearly establishes the sheets emitted no odor in the cab. Moreover, no evidence establishes Mr. Valadez-Gallegos ever opened the door of the camper.

Even though authorities found the lipstick-smudged, annotated road map in the cab where Mr. Valadez-Gallegos was the only passenger, nothing shows a

direct link between the annotations and drug activity, when the annotations were made, or even who made them. Moreover, Officer Johnston testified it was not unusual for vacationers to carry a road map in a vehicle with markings, including mileage and time scheduling.

Even though Mr. Valadez-Gallegos said the vehicle never left his sight, his failure to respond when asked how the ephedrine got in the camper is not dispositive. No evidence establishes whether Mr. Valadez-Gallegos slept in the cab or camper, drove or had keys to the vehicle, or accessed or accompanied Mr. Marquez-Munoz into the camper, or even looked in it. Likewise, no evidence establishes when the ephedrine was hidden in the ceiling.

Mr. Valadez-Gallegos' statement he knew others must be involved but did not know who they were or the destination for the ephedrine, is not dispositive, but merely an inference. Similarly, Mr. Marquez-Munoz's statement to Mr. Valadez-Gallegos he "didn't know there was heroin," creates only an attenuated inference, insufficient to establish a direct link between Mr. Valadez-Gallegos and the ephedrine.

The other evidence presented to the jury also does not establish Mr.

Valadez-Gallegos' constructive possession of the ephedrine. At trial, Officer Johnston testified Mr. Valadez-Gallegos showed no signs of nervous behavior, while Mr. Marquez-Munoz showed signs of extreme nervousness, including a shaky voice, trembling hands, shaking legs, vomiting, defecating, excessive urinating and smoking. He testified Mr. Valadez-Gallegos sat the same way during the trial as he sat the night of the arrest – stiffly and straight-up, avoiding eye contact – which could be his normal behavior. Officer Johnston acknowledged Mr. Valadez-Gallegos' irritated or evasive behavior during the initial stop may have resulted from his own limited ability to speak Spanish. He also acknowledged the roll of black, sticky tape found inside the truck's cab, though uncommon, is similar to that seen in "work trucks." Nothing in the evidence establishes Mr. Valadez-Gallegos knew, or should have known, the same black tape helped seal a hidden ceiling compartment containing the ephedrine. The fact Mr. Valadez-Gallegos spent $400 dollars in two days and did not know the driver except by his nickname does not establish the required nexus. In fact, Officers Johnston and Hartranft testified nothing in the vehicle nor their investigation directly connected Mr. Valadez-Gallegos to the ephedrine found in the truck.

Finally, even assuming proper admission of the 404(b) evidence of Mr.

Valadez-Gallegos' prior Oklahoma stop, that evidence was admitted for the limited purpose of showing knowledge, intent and pattern. The fact Mr. Valadez-Gallegos was a passenger in another vehicle containing ephedrine created only an inference of his involvement in an illegal activity. The 404(b) evidence admitted did not establish the ephedrine's location in the other vehicle or whether Mr. Valadez-Gallegos knew of its existence, or had possession or control over it.

In instances where there is joint occupancy, as here, constructive possession requires a link or nexus between Mr. Valadez-Gallegos and the contraband. *See Miller*, 84 F.3d at 1253. Here, the government failed to present evidence sufficiently linking Mr. Valadez-Gallegos with the contraband found in the camper. Consequently, the evidence cannot sustain the conviction and sentence.

<u>Rule 404(b) Evidence</u>

Having found the evidence, including the Rule 404(b) evidence at issue, insufficient to find Mr. Valadez-Gallegos guilty beyond a reasonable doubt, we need not reach the remaining issue presented by Mr. Valadez-Gallegos on appeal. The evidence being insufficient, the judgment on conviction is **REVERSED**.