**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 12 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

JOSE ALFREDO FIGUEROA,

      Defendant-Appellant.

No. 99-6180
(D.C. No. CR-98-160-R)
(Western District of Oklahoma)

**ORDER AND JUDGMENT**[*]

Before **EBEL**, **MCKAY**, and **BRISCOE**, Circuit Judges.

Appellant Jose Alfredo Figueroa ("Figueroa") was convicted after a

jury trial of one count of knowingly and intentionally possessing with the intent to

distribute thirty-one pounds of methamphetamine in violation of 21 U.S.C. §

841(a)(1), and one count of being an alien who had been previously deported on

May 29, 1997 in violation of 8 U.S.C. § 1326(a). On appeal, Figueroa argues that

(1) there was insufficient evidence to support both counts of which he was

convicted, and (2) the district court erred when it failed to sustain a motion to

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. This court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

suppress evidence. We exercise jurisdiction under 28 U.S.C. § 1291 and AFFIRM.

## BACKGROUND

On July 20, 1998, Figueroa, along with Vicente de la Torre, was traveling eastbound on I-40 in Oklahoma approximately six miles from the Texas boarder in a green 1992 Ford Explorer, when Oklahoma Highway Patrolman Grant Byrns clocked the car going 83 m.p.h. in a 60 m.p.h. zone. Trooper Byrns stopped the car at approximately 6:40 a.m. to issue a citation for speeding.

While Trooper Byrns was approaching the car to ask for the driver's license, he noticed fast food wrappers in the back seat, along with a medium sized ice chest. When the Trooper reached the driver's side of the vehicle, Figueroa opened the window. At that point, the officer detected a strong smell of air freshener coming from the car, although he was unable to locate a source for the smell. Trooper Byrns asked the driver, Figueroa, for his license and insurance verification, and also requested Figueroa to accompany him back to his patrol vehicle. Although the license tag on the car was from Oklahoma, Figueroa handed the trooper a California license. In his patrol car, Trooper Byrns proceeded to check on the validity of Figueroa's California license and the vehicle registration, whether there were any warrants for his arrest, and whether the vehicle had been reported stolen. A few minutes later, the trooper asked

dispatch to institute an EPIC[1] check, from the El Paso Information Center, to determine if Figueroa was an illegal alien, or had been involved in any criminal or smuggling activities. The vehicle registration check showed that the 1992 Ford Explorer was not in Figueroa's name. When asked about this fact, Figueroa replied that the car was a friend's. He did not identify the friend, and the trooper did not ask Figueroa to identify the friend at that time. Figueroa further told the trooper that he was coming from California and that he had picked up his passenger in New Mexico. Trooper Byrns testified that during this conversation with Figueroa, he understood all of his questions, and responded in English, appropriately, to his inquiries. Trooper Byrns then proceeded to write a citation for the speeding violation.

At some point while Trooper Byrns was writing up the citation, he went back to the vehicle to obtain information from the passenger in the vehicle, Vicente de la Torre. The trooper then submitted the passenger's information to dispatch and had them run the same checks they were then running on Figueroa. Either during or shortly after issuing the citation to Figueroa, the check revealed that de la Torre was wanted by INS. After providing dispatch with further information on de la Torre, the trooper was informed that he was a deported alien

---

[1] EPIC monitors travel and transport across the U.S. borders. EPIC is not a law enforcement agency, but a data collection agency whose results are used by various law enforcement agencies.

with an outstanding warrant issued by INS. At some point after receiving this information, Trooper Byrns placed de la Torre under arrest. At approximately 7:24 a.m., Trooper Byrns was informed by dispatch that EPIC had advised that Figueroa was deported in 1997 and should not be in this country. Dispatch then advised that it was attempting to obtain further information concerning Figueroa from INS.

Sometime prior to 7:00 a.m., but after Trooper Byrns had issued Figueroa the citation for speeding and returned all of his documents, he first asked Figueroa if he was carrying any drugs, cash or weapons, and then asked for permission to search the 1992 Ford Explorer. Figueroa told the trooper he could search the car. Trooper Byrns then proceeded to search the car with the assistance of another officer who had arrived at the scene. After he received the information from EPIC that Figueroa had previously been deported, Trooper Byrns desired to search the car more thoroughly. He therefore asked Figueroa to follow him to a local service station in Sayre, Oklahoma, where he could put the car up on a lift and run a drug dog around the outside of the vehicle. Figueroa consented and followed Trooper Byrns to Tosh's Texaco in Sayre.

Trooper Byrns testified that while he was awaiting EPIC information and after he received the report from dispatch at 7:24 a.m., Figueroa was not free to leave. He further testified that if Figueroa had not followed him to Tosh's, he

- 4 -

would have chased him. It is not disputed that Figueroa was in custody for Fourth Amendment purposes at this time. Once the Ford Explorer arrived at Tosh's, the drug dog alerted strongly to the dashboard of the vehicle. With the help of Kevin Tosh, an employee of Tosh's, the dashboard was disassembled, but no drugs were found. It was discovered during the search, however, that the green vehicle was originally black, and had been painted. While this searching was being conducted, Agent Valentine of the INS called Trooper Byrns and requested that he place Figueroa under arrest, which he did.

On July 24, 1998, a Cleveland County, Oklahoma Drug Task Force officer contacted the Oklahoma Highway Patrol dispatch and inquired about a Ford Bronco that had been stopped by Trooper Byrns. The officer had information that drugs or money might have been in the vehicle. Nothing came of this phone call; however, on August 19, 1998, Trooper Byrns received another call from the same Drug Task Officer inquiring about a black Ford Explorer, and describing the stop Trooper Byrns had made on July 20, 1998. The officer informed Trooper Byrns that he believed there was methamphetamine hidden behind the speakers of the vehicle. Recalling the once black, now green, Ford Explorer at Tosh's, Trooper Byrns awaited a telephone call from another police officer to discuss obtaining a search warrant in order to search the vehicle.

In order to obtain certain information about the Ford Explorer, Trooper Byrns called Kevin Tosh. He asked for the VIN number and the color of the vehicle. He also asked Kevin Tosh whether, during the original search, the speakers had been removed. Tosh provided the requested information and told Trooper Byrns he believed they had searched behind the speakers. Trooper Byrns told Tosh not to permit anyone to remove the vehicle from the premises.

While returning from Elk City, Trooper Byrns was paged by dispatch, which told him to call Kevin Tosh. Trooper Byrns called Kevin Tosh, and was told that Tosh had used a screwdriver to pry open the speaker, where he discovered "stuff" wrapped in duct tape. Trooper Byrns then drove to the impound lot, where Kevin Tosh directed him to the vehicle. Byrns entered the vehicle through the driver's side door and observed the bundles of drugs wrapped in duct tape behind the driver's side rear speaker. After finding rubber gloves and a box, Trooper Byrns removed a bundle. An FBI agent field tested the contents of one of the packages, which tested positive for methamphetamine. The doors to the Explorer were then taped closed until a warrant could be obtained for the remainder of the vehicle.

On August 21, 1998, a warrant was obtained for the vehicle. A further search of the car revealed twelve additional bundles hidden behind the speaker on the passenger side. Air fresheners were found inside the speaker area with the

drugs. In all, thirty-one pounds of methamphetamine was found in the Ford Explorer.

During this final search of the vehicle, the officers found several documents, including the title to the car showing the vehicle owner as "Juan Cadera."[2] An assignment section on the back showed transfer of the vehicle by Juan A. Cadena to Evelin Cervantes on March 22, 1998. The officers also found an insurance verification form which had been issued for the vehicle on January 17, 1998 to a Magdeleno Cadena. Finally, there was an Emission and Inspection Certificate found in the car that had been issued in June of 1998, reflecting the owner of the vehicle as Magdeleno Cadena.

Following a jury trial in December 1998, Figueroa was found guilty of (1) knowingly and intentionally possessing with the intent to distribute thirty-one pounds of methamphetamine in violation of 21 U.S.C. § 841(a)(1), and (2) being an alien who had been previously deported on May 29, 1997 in violation of 8 U.S.C. § 1326(a). Figueroa was sentenced to a term of imprisonment of 240 months. Figueroa now appeals his conviction.

---

[2] There was apparently a misspelling of Juan Cadena's name on the Certificate of Title.

**DISCUSSION**

**I. Sufficiency of the Evidence**

Figueroa first claims that there was insufficient evidence to support his convictions on both counts one and two: knowingly and intentionally possessing methamphetamine with the intent to distribute and being an alien who had previously been deported, respectively.

When evaluating the sufficiency of the evidence, we review "the evidence–both direct and circumstantial, together with all reasonable inferences to be drawn therefrom–in the light most favorable to the government." United States v. Hooks, 780 F.2d 1526, 1529 (10th Cir. 1986); United States v. Lazcano-Villalobos, 175 F.3d 838, 843 (10th Cir. 1999). We then determine "whether there is substantial evidence from which a jury might properly find the accused guilty beyond a reasonable doubt." Lazcano-Villalobos, 175 F.3d at 843. "[W]hile the evidence supporting the conviction must be substantial and do more than raise a mere suspicion of guilt, it need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt." United States v. Johnson, 42 F.3d 1312, 1319 (10th Cir. 1994) (internal quotations and citations omitted). Furthermore, we do not act as the jury. "The jury, as fact finder, has discretion to resolve all conflicting testimony, weigh the

evidence, and draw inferences from the basic facts to the ultimate facts." United States v. Valadez-Gallegos, 162 F.3d 1256, 1262 (10th Cir. 1998).

A. Count I

With regard to count I, the government was required to establish beyond a reasonable doubt that (1) Figueroa knowingly possessed a controlled substance and (2) he possessed the drug with the specific intent to distribute it. See 21 U.S.C. § 841(a)(1); United States v. Reece, 86 F.3d 994, 996 (10th Cir. 1996).

Figueroa argues that the government failed to show a link between himself and the drugs in the vehicle and therefore failed to carry its burden of proving that he had constructive possession over the drugs. "A person constructively possesses contraband when he or she knowingly holds ownership, dominion or control over the object and premises where it is found." Lazcano-Villalobos, 175 F.3d at 843. We have held that an inference of knowledge arises if the defendant has exclusive possession of the object or premises; however, the same inference cannot be made when there is joint occupancy of the vehicle. Id.; Valadez-Gallegos, 162 F.3d at 1262. Thus, Figueroa's joint occupancy of the Ford Explorer with Vicente de la Torre is not sufficient to establish an inference of constructive possession. "To prove constructive possession where there is joint occupancy, the government must present direct or circumstantial evidence to show some connection or nexus individually linking [Figueroa] to the contraband."

_Lazcano-Villalobos_, 175 F.3d at 843. While we may not uphold a conviction by piling inference upon inference, "an inference of constructive possession is reasonable if the conclusion flows from logical and probabilistic reasoning." _Id._ Thus, the government must have provided sufficient evidence supporting at least a probable inference that Figueroa knew of the methamphetamine hidden behind the speakers of the car he was driving.

In this case, we find that the totality of the circumstantial evidence and the reasonable inferences therefrom support the jury's finding of Figueroa's guilt beyond a reasonable doubt as to the issue of his knowing possession of methamphetamine. The evidence presented at trial reveals that Figueroa was driving a car that was filled with a strong odor of air freshener, yet the source of the air fresheners was not visible in the car. It is certainly logical to infer that a driver of a vehicle would be suspicious of such a strong smell of air freshener upon entering a car he had borrowed from a friend, particularly when the source of that smell can not be identified. Although the presence of a potent odor of air freshener does not, by itself, establish that Figueroa knew about the methamphetamine, it can be used together with other circumstantial evidence in the record to find that Figueroa had the requisite knowledge. _Hooks_, 780 F.2d at 1531-32.

For instance, the record further reveals that Figueroa told Trooper Byrns that a friend had loaned him the vehicle. Figueroa also submitted to the court an affidavit stating that he had borrowed the car from his friend Juan Cadena. Juan Cadena, however, testified at trial that he did not know Figueroa and that he had not loaned him the vehicle. Moreover, Juan Cadena testified that he had sold the car to an Evelin Cervantes a few months prior to the time Figueroa was stopped by Trooper Byrns, and had not seen her or the car since that sale was made. The Certificate of Title reflected this transaction. From this evidence, the jury was entitled to infer that Figueroa's version of how he came into possession of the car was a fabrication and further reasonably infer Figueroa's guilty knowledge from these false statements. Furthermore, the jury had testimony from an FBI agent that sophisticated drug trafficking enterprises often use secret compartments in vehicles to smuggle drugs through the United States. The agent further testified that these courier vehicles are never owned by the drivers, and in his experience, the drivers almost always consent to a search of the vehicle, as was the situation in this case.

Finally, the fact that Figueroa was driving a car with thirty-one pounds of methamphetamine valued at approximately $310,000 also leads to the inference that he knew he was transporting drugs. This court has often recognized both the relevance and importance of evidence of the value of drugs to prove knowledge.

See United States v. Rodriguez, 192 F.3d 946, 950 (10th Cir. 1999) (collecting cases which support proposition that value of drugs is relevant to knowledge of drugs' presence); Hooks, 780 F.2d at 1532 (finding that value of drugs in truck supported knowing possession given that it is unlikely that the owner of the truck would have left $10,000 worth of PCP in the truck); see also United States v. Pollock, 926 F.2d 1044, 1050 (11th Cir. 1991) (finding that "[t]he most significant evidence supporting [the defendant's] knowing possession with intent to distribute is the large value of the cocaine"). Therefore, given the strong smell of air freshener without a visible source, the defendant's contradicted statement as to how he came into possession of the car, and the large value of the methamphetamine found in the car, we hold that a jury could have found Figueroa knowingly possessed the methamphetamine in the vehicle beyond a reasonable doubt.[3]

---

[3] Figueroa points to our decision in United States v. Valadez-Gallegos, 162 F.3d 1256 (10th Cir. 1998), to support his argument that there was insufficient evidence to show knowledge. Valadez-Gallegos is easily distinguishable from the present case. In Valadez-Gallegos, we found that there was insufficient evidence to support a guilty verdict on the charge of knowingly possessing with the intent to distribute, when the only evidence to support the charge was inconsistent statements about travel dates, times, and accommodations and the large quantity of drugs in the camper shell of a pickup truck. Valadez-Gallego, 162 F.3d at 1262-63. We noted that the large quantities of drugs in the ceiling did not directly link the passenger to the drugs; particularly given the fact that no suspicious odor could be detected in the cab of the truck, as opposed to the camper shell where the drugs were eventually found. Id. In contrast, the facts of the present case show that, in addition to the contradicted statements of the

As to the second element of the charge, that Figueroa had the intent to distribute the methamphetamine, the large quantity of methamphetamine in the car is sufficient to support a judgment that Figueroa intended to distribute the methamphetamine. See Hooks, 780 F.2d at 1532. Therefore, we affirm his conviction on this count.

B. Count II

Figueroa next argues that there was insufficient evidence to support his conviction for illegal entry by an alien previously deported or removed pursuant to 8 U.S.C. § 1326. Specifically, Figueroa argues that there was insufficient evidence to show that he was an illegal alien on July 20, 1998. We disagree.

In order to prove a conviction under 8 U.S.C. § 1326, the government was required to show that (1) at the time of the indictment, Figueroa was an alien, (2) that Figueroa was arrested and deported from the United States, (3) that thereafter Figueroa voluntarily reentered or was found in the United States, and (4) that Figueroa was in the United States without the permission of the Attorney General.

---

defendant and the large value of the drugs in the car, Figueroa was the driver of a vehicle, see United States v. Levario, 877 F.2d 1483, 1485-86 (10th Cir. 1989) (holding "it is permissible to infer that the driver of a vehicle has knowledge of the contraband within it") (emphasis added), overruled on other grounds by, Gozlon-Peretz v. United States, 498 U.S. 395, 111 S.Ct. 840, 112 L.Ed.2d 919 (1991), in which there was a strong odor of air freshener with no visible source. The addition of these two important facts convinces us that there was sufficient evidence for a jury to find knowledge beyond a reasonable doubt.

See 8 U.S.C. § 1326. The jury was instructed that an alien "is any person who is not a natural-born or naturalized citizen, or a national of the United States." The record reflects that the government proved all of the required elements.

First, the government presented proof that Figueroa was an alien in 1992, who was deported in 1997. The government presented the record of a prior judgment against Figueroa indicating that he was convicted of being an alien who knowingly entered the United States illegally in 1992. In addition, the government admitted into evidence the warrant of deportation or removal that was issued for Figueroa in 1997.[4] An INS agent testified that this document showed that Figueroa was ultimately deported in 1997, which deportation was witnessed by an INS agent.[5] In addition, the government introduced a written certification that an INS officer had made a diligent search of INS records, and that this search

[4] The INS agent further testified that the reason Figueroa was not deported until 1997 was because he absconded in 1992 and was not located again until 1997. Figueroa suggests that during this five year period, he could have become a citizen of the United States. As discussed below, this contention is belied by Figueroa's own admission that he was a citizen of Mexico during his booking on the current charges.

[5] Figueroa suggests in his brief that the warrant of deportation or removal which stated that an INS agent had witnessed the deportation in 1997 was not sufficient evidence that he had been deported in 1997. Other courts have found that this warrant is admissible in trial as proof that a defendant was arrested and deported. See United States v. Quezada, 754 F.2d 1190, 1193-94 (5th Cir. 1985) (holding that warrant of deportation is admissible hearsay under Fed. R. Evid 803(8)(B) to prove defendant was deported); United States v. Hernandez-Rojas, 617 F.2d 533, 534-35 (9th Cir. 1980) (same). We agree with these courts that the warrant of deportation is admissible to prove a defendant was in fact deported.

had produced no record that Figueroa had reapplied for admission to the United States after deportation or been granted permission to reapply. Pursuant to 8 U.S.C. § 1360, a written certification from an INS officer that a diligent search of INS records has been made and no record or entry can be found "shall be admissible as evidence in any proceeding as evidence that the records of the Service contain no such record or entry, and shall have the same effect as the testimony of a witness given in open court." 8 U.S.C. § 1360(d). Thus, the government produced evidence from which the jury could conclude that Figueroa had not applied for readmission to the United States nor had he been granted admission by the Attorney General, an obvious first step to becoming a naturalized citizen.

Finally, the government presented evidence at trial that when Figueroa was booked into the custody of the U.S. Marshal on September 10, 1998, the deputy who made the fingerprint record obtained the information he placed on the card from charging documents and from the defendant himself. The information on the card indicated that the only charge at that time was 21 U.S.C. § 841(a)(1), and further indicated that the defendant's country of citizenship was Mexico. Based upon the foregoing evidence, the jury could reasonably find that the defendant was an alien on July 20, 1998 who had previously been deported. Thus, we find

that there was sufficient evidence for a jury to find Figueroa guilty beyond a reasonable doubt on count II.

**II. Motion to Suppress**

"In reviewing the denial of Defendant's motion to suppress evidence, the trial court's findings of fact are accepted unless clearly erroneous, and the evidence is considered in the light most favorable to the government." United States v. March, 999 F.2d 456, 459 (10th Cir. 1993) (internal quotations omitted).

A. Standing

Figueroa initially argues that the district court erred in finding he lacked standing to contest the search of the vehicle. The district court determined that Figueroa did not have an expectation of privacy in the Ford Explorer and therefore could not challenge the legality of the search. We agree with the district court.

The Supreme Court has recognized that the issue of "standing" is "invariably intertwined" with substantive Fourth Amendment privacy rights analysis. See Rakas v. Illinois, 439 U.S. 128, 139-40, 99 S.Ct. 421, 428, 58 L.Ed.2d. 387 (1978). Thus, our inquiry must focus on "whether there has been a violation of the Fourth Amendment rights of the particular defendant who is seeking to exclude the evidence." United States v. Betancur, 24 F.3d 73, 76 (10th Cir. 1994). It is immaterial whether the Fourth Amendment rights of another

were violated as "Fourth Amendment rights are personal and cannot be asserted vicariously." United States v. Arango, 912 F.2d 441, 445 (10th Cir. 1990). "A defendant who seeks to exclude evidence carries the burden of establishing that his own Fourth Amendment rights have been violated as a result of a search." Betancur, 24 F.3d at 76.

To determine whether a search has violated the Fourth Amendment rights of a defendant, we examine two factors: "whether the defendant manifested a subjective expectation of privacy in the area searched and whether society would recognize that expectation as objectively reasonable." United States v. Martinez, 983 F.2d 968, 972 (10th Cir. 1992) (further quotations and citations omitted).

Applying these principles in United States v. Arango, we held that a non-owner of a truck did not have a reasonable expectation of privacy, because he failed to present evidence that he was in lawful possession of the truck. Arango, 912 F.2d at 444-46. We stated that "[a]lthough . . . the proponent of a motion to suppress need not always come forward with legal documentation establishing that he lawfully possessed the area searched, the proponent must at least state that he gained possession from the owner or someone with the authority to grant possession." Id. at 445.

We agree with the district court that Figueroa has not established a reasonable expectation of privacy in the Ford Explorer. Figueroa has failed to

- 17 -

carry his burden of showing that he was in lawful possession of the vehicle. The only evidence Figueroa presented to the district court to establish lawful possession was an affidavit stating that his friend, Juan Cadena, gave him permission to drive the car. This affidavit, however, is contradicted by several documents found in the car as well as Juan Cadena's own testimony at trial.

First, the Certificate of Title found in the Ford Explorer shows that Juan Cadena transferred title to the car to an Evelin Cervantes on March 22, 1998, several months before Figueroa was stopped in Oklahoma. Also found in the car during the search on July 20, 1998 was the Security Verification for Liability Insurance issued in January 1998 to a Magdeleno Cadena. Juan Cadena testified at trial that Magdeleno was his deceased father and that he took insurance out in his name. Juan Cadena further testified that this insurance was canceled in April shortly after he sold the car to Cervantes. Thus, the insurance is not probative of ownership. Finally, the police also found in the Ford Explorer an Oklahoma Emission and Mechanical Inspection Certificate for the Vehicle issued on June 29, 1998, to Magdeleno Cadena. Although this was issued after the sale of the car to Cervantes, Juan Cadena testified that he left the insurance certificate issued to Magdeleno in the car when it was sold, thus, leaving open the possibility that the new owner used that insurance slip and its information to obtain the Emission Inspection Certificate.

- 18 -

Furthermore, Juan Cadena filed a sworn answer stating that he had sold his car in March 1998 to Evelin Cervantes and denied knowing Figueroa or his passenger Vicente de la Torre. This denial was reiterated when Juan Cadena testified at trial. At trial, Juan Cadena stated that he bought, repaired, and then sold cars as a sideline business, and that he had bought the Ford Explorer at an auction in January and then sold it two months later in March to Evelin Cervantes, whom he did not know prior to the sale or stay in contact with after the sale.

Even if, however, Juan Cadena did give Figueroa permission to drive the car, Figueroa has not presented any evidence that Juan Cadena's possession of the vehicle after the transfer of title was lawful, or that he had authority to grant possession to Figueroa. The Certificate of Title clearly shows a transfer in title from Juan Cadena to Evelin Cervantes. Figueroa presented no evidence that Juan Cadena then had permission from Ms. Cervantes to drive or loan out the vehicle to others. In fact, Juan Cadena testified at trial that he did not know Ms. Cervantes before selling her the car and had no idea where she was after he sold her the car. The Oklahoma Emission Certificate is insufficient to establish a connection, particularly given the fact that Figueroa presented no evidence, testimonial or otherwise, in regard to this Certificate or how it could have linked

Juan Cadena to Evelin Cervantes, the owner of the vehicle.[6]  Thus, there is a complete absence of evidence explaining how or why Juan Cadena would have had possession of the vehicle after he transferred title to Ms. Cervantes.  "To presume that [Figueroa's] possession of the car was legitimate in the absence of any such evidence would be inconsistent with the burden of proof on this issue, which lies with the proponent of a motion to suppress." United States v. Rascon, 922 F.2d 584, 587 (10th Cir. 1990) (no standing where no evidence as to how non-owner Mr. Avita, who gave defendant permission to drive car, himself came to possess the vehicle, despite assertion by defendant that owner was brother in law of Mr. Avita); see also Martinez, 983 F.2d at 973 ("Although affidavits indicated Defendants believed Ms. Lopez had authority to loan them the car, no evidence was produced at the suppression hearing to show Ms. Lopez had any authority to grant either Ms. Araujo or Ms. Martinez permission to possess the vehicle.").  Thus, Figueroa failed to establish that he had a reasonable expectation of privacy in the car.

---

[6] As noted above, a logical inference could be made that the owner of the car used the expired insurance in Magdeleno's name, which was left in the car after Juan Cadena made the sale, to obtain the Emission Certificate, thus, eliminating any connection between Juan Cadena and Ms. Cervantes.

B. Illegal Detention

Although we have found that Figueroa cannot challenge the search of the Ford Explorer, he still may challenge his own seizure. "We distinguish passenger standing to directly challenge a vehicle search from passenger standing to seek suppression of evidence discovered in a vehicle as the fruit of an unlawful stop, detention, or arrest." United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996) (internal quotations and citations omitted). If the methamphetamine found in the Ford Explorer was the fruit of Figueroa's unlawful detention, it must be suppressed. See id.

Figueroa does not contest the justification for the initial stop,[7] nor does he complain about the length of time from the initial stop to the delivery of the warning citation. Rather, Figueroa claims that he was unlawfully detained in violation of the Fourth Amendment when Trooper Byrns extended the length of the traffic stop after he returned Figueroa's documents to ask him about drugs and for consent to search the Ford Explorer, because Trooper Byrns had no reasonable suspicion to further detain Figueroa. The district court concluded that the

---

[7] "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995). Trooper Byrns clocked Figueroa traveling 83 m.p.h. in a 60 m.p.h. zone. Based on this speeding violation, Trooper Byrns was justified in making a traffic stop.

continued detention was justified on the basis of reasonable suspicion. We

agree.[8]

It is well established that during a routine traffic stop, a law enforcement

officer may request a driver's license and vehicle registration, run a computer

check, and issue a citation. See United States v. Elliott, 107 F.3d 810, 813 (10th

Cir. 1997). Once the driver produces a valid license and registration, he is free to

go on his way without the delay of further questioning. See id. However, if the

officer wants to detain the driver for further questioning he may do so if "(1)

'during the course of the traffic stop the officer acquires an objectively reasonable

and articulable suspicion that the driver is engaged in illegal activity'; or (2) 'the

driver voluntarily consents to the officer's additional questioning.'" Id. (quoting

Sandoval, 29 F.3d at 540). If, however, the officer continues to question the

driver in the absence of either of these two circumstances then "any evidence

---

[8] Alternatively, because Trooper Byrns returned Figueroa's documents before asking him any questions we believe that the detention at this time could be viewed as a consensual encounter. While we have held that the return of the driver's documents is required before a detention can end and a consensual encounter can be found, we have also stated that the return of the documents does not automatically equate to a consensual encounter. See United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997). Here, there is evidence that the driver had an objective reason to believe that he was not free to end his conversation with the officer and proceed on his way. See United States v. Sandoval, 29 F.3d 537, 540 (10th Cir. 1994). Therefore, we cannot find that the stop had turned into a consensual encounter.

derived from that questioning (or a resulting search) is impermissibly tainted in Fourth Amendment terms." Id. (internal quotations and citation omitted).

The government relies upon the following as providing Trooper Byrns with reasonable and articulable suspicion: the strong odor of air freshener, Trooper Byrns' knowledge from the computer checks that Figueroa had a criminal history, the fact that Figueroa was driving a vehicle that did not belong to him and the title owner was not in the car, the presence of fast food wrappers and an ice chest in the car, and the knowledge that the passenger in the vehicle was an illegal alien with an outstanding warrant for his arrest. "When evaluating these factors, we judge the officer's conduct in light of common sense and ordinary human experience. Our task . . . is not to pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious, but rather to determine whether the totality of the circumstances justify the detention." United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997) (internal quotations and citations omitted).

Initially, as the district court did, we discount Trooper Byrns' reliance on the food wrappers and ice chest in the car. We have previously held that remnants from fast food restaurants can be found on the floor of many cars and "describes a very large category of presumably innocent travelers, and any suspicion associated with these items is virtually nonexistent." United States v.

- 23 -

Wood, 106 F.3d 942, 947 (10th Cir. 1997).   Likewise, the presence of an ice chest in a car, an item found in many cars making long trips, cannot be said to give rise to reasonable suspicion.

Additionally, we must discount the government's reliance on the fact that the passenger, Vicente de la Torre, was an illegal alien with an outstanding warrant for his arrest.  Trooper Byrns testified at the motion to suppress that he was unclear whether he knew about de la Torre's status prior to asking Figueroa questions about the presence of drugs and guns, or for permission to search the vehicle.  Thus, we cannot rely on a factor that the trooper cannot say with certainty he knew at the relevant time.  We are therefore left with the strong odor of air freshener, the knowledge of Figueroa's positive criminal history, and the fact that Figueroa was not the owner of the vehicle he was driving.

First, we agree with the government's assertion that a strong odor of air freshener "may give rise to reasonable suspicion on the part of law enforcement officials that the odor is being used to mask the smell of drugs," provided the officer is aware of the fact that drug smugglers often use air fresheners to mask the smell of certain drugs.  United States v. Salzano, 158 F.3d 1107, 1114 (10th Cir. 1998); see also United States v. Villa-Chaparro, 115 F.3d 797, 802 (10th Cir. 1997) (strong odor of detergent and presence of crystals on floorboard supported reasonable suspicion of presence of drugs in vehicle).  Here, Trooper Byrns

testified that when he approached the vehicle he smelled a strong odor of air freshener coming from the car, although no source for the fresheners was visible. Furthermore, he stated that he was aware that drug couriers often mask the scent of certain smells of drugs with the use of air fresheners. (Vol. 2 at 12.) Thus, we agree with the district court that this was an important factor giving rise to reasonable suspicion.

In addition, Trooper Byrns testified that he was informed of Figueroa's criminal history. Although information regarding a person's criminal history in itself is insufficient to justify a seizure, in combination with other factors it can constitute a sufficient basis for prolonging a detention. See Sandoval, 29 F.3d at 542. Finally, the government relies on the fact that Figueroa was not the owner of the vehicle, Figueroa had a California license although the tags on the car were from Oklahoma, and the titled owner was not in the car with him. When asked who owned the vehicle, he responded that a friend did, without offering any further information. In United States v. Villa-Chaparro, we noted that an important factor supporting the officer's reasonable suspicion was the fact that "Defendant was not the registered owner of the vehicle." 115 F.3d at 802. Here Trooper Byrns' knowledge that Figueroa was not the registered owner, did not offer the name of the registered owner, and had a California license while the

car's tags were from Oklahoma, was certainly important in supporting his finding of reasonable suspicion.

Taking the above factors together, i.e., the strong smell of air freshener, the positive criminal history, and the fact that Figueroa was not the owner of the vehicle, we believe that Trooper Byrns had sufficient reasonable suspicion to justify the further detention of Figueroa to ask him whether he was carrying any drugs and whether he would consent to a search of his vehicle.

C. The Consent

Having concluded that Trooper Byrns lawfully detained Figueroa during the brief period during which he asked Figueroa if he was carrying any drugs and whether he would consent to a search of the Ford Explorer, we must now determine whether Figueroa's subsequent consent was voluntary. "A person who is being detained may give a voluntary consent to search." Mendez, 118 F.3d at 1432. When determining voluntariness, we consider whether the consent was "unequivocal and specific and freely and intelligently made," and whether the "consent was given without implied or express duress or coercion." United States v. McRae, 81 F.3d 1528, 1537 (10th Cir. 1996). On appeal, Figueroa's contention

that his consent was involuntary is based solely on his argument that his language barrier prevented him from understanding the Trooper's question.[9]

The district court found that Figueroa spoke and understood English during the encounter. Trooper Byrns testified that when he spoke with Figueroa during the July 20, 1998 stop, Figueroa had no difficulty communicating with the officer or understanding him. Additionally, there was evidence before the court that Figueroa had lived in the United States since 1977 and had filed taxes. Based on this evidence, we cannot say that the district court's determination that Figueroa spoke and understood English during the stop was clearly erroneous and therefore cannot conclude that Figueroa's consent was involuntary because he could not understand English. Furthermore, we have reviewed the circumstances of Figueroa's consent, and find no signs of coercion or duress, and no reason to believe it was not unequivocally and freely given. Accordingly, we conclude that the search was legal.

---

[9] At the end of Appellant's brief, Appellant attempts to adopt the materials he filed in the district court to supplement the arguments made in his brief to this court, rather than setting forth in his appellate brief his quarrel with the district court's findings. This is not acceptable. "Allowing litigants to adopt district court filings would provide an effective means of circumventing the page limitations on briefs set forth in the appellate rules and unnecessarily complicate the task of an appellate judge." Gaines-Tabb v. ICI Explosives, USA, Inc., 160 F.3d 613, 624 (10th Cir. 1998) (internal citations omitted). Thus, appellant's arguments that are not set forth in the brief are waived.

Finally, while Trooper Byrns was conducting his initial search of the car, he was notified by dispatch of Figueroa's status as an illegal alien. At that point, Trooper Byrns had dispatch contact INS and do further checking to determine whether Figueroa should be arrested. This investigative detention lasted approximately two hours. Trooper Byrns was clearly justified in detaining Figueroa at this point, because he had a reasonable suspicion that he was violating the laws of the United States. Moreover, the two hours it took to check on Figueroa's status and determine that INS wanted him arrested was not unreasonable, in light of the diligence utilized by Trooper Byrns in immediately following up on the information from dispatch. See Shareef, 100 F.3d at 1507 (relying on fact that officers "diligently pursued a means of investigation" in finding length of detention did not violate Fourth Amendment). We therefore conclude that the district court correctly denied defendant's motion to suppress.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

ENTERED FOR THE COURT

David M. Ebel
Circuit Judge