**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 23, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

PERON MERISE,

Defendant-Appellant.

No. 10-2033
(D.C. No. 2:09-CR-00402-MV-1)
(District of New Mexico)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, Chief Judge, **HOLLOWAY**, and **MURPHY**, Circuit Judges.[**]

Defendant-Appellant Peron Merise was indicted on one count of knowingly and intentionally possessing with intent to distribute 100 kilograms or more of marijuana in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B), and for aiding and abetting in violation of Title 18, United States Code, Section 2. Merise's case proceeded to trial on September 9, 2009. At the conclusion of the government's case, Merise moved for a directed verdict which the district court denied. On September 11,

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**] After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

2009, Merise was found guilty by a federal jury. On September 15, 2009, Merise filed a motion for judgment of acquittal which the district court denied on October 9, 2009. On February 8, 2010, the district court sentenced Merise to 60 months of imprisonment and 4 years of supervised release. On February 16, 2010, the district court entered its final judgment and on the same day, Merise timely filed his notice to appeal his conviction and sentence. We exercise jurisdiction pursuant to Title 28, United States Code, Section 1291.

## I. FACTS

### A. Merise's Arrest

Merise was the owner and operator of Lucky Star Transport. He owned a single tractor rig which he used to haul a refrigerated trailer that he was in the process of purchasing from Extreme Express. On December 13, 2008, a total of 277 kilograms of marijuana was found in Merise's trailer during an inspection at the port of entry in Lordsburg, New Mexico.

Officer Christopher Alvarez of the New Mexico Department of Public Safety testified that while he was working at the Lordsburg port of entry on December 13, 2008, Merise's truck entered the port of entry around 4:25 p.m. that day. R. Vol. 3 at 33. Officer Alvarez testified that Merise was driving the truck and that no other passengers occupied the truck with him. *Id.* at 54. Officer Alvarez asked for Merise's logbook and bills of lading and testified that he noticed inconsistencies between them. *Id.* at 33-34. For example, the bills of lading showed that on December 11, 2008, Merise picked up

loads in three different places. *Id.* at 35. Merise's logbook, however, showed that he had been in the sleeper berth of his truck during that time period. *Id.*

Officer Alvarez then advised Merise that he would inspect Merise's cargo and asked Merise to open his trailer. *Id.* at 36. Merise unlocked the padlock that secured the trailer door. *Id.* at 38. When Merise opened the trailer door, Officer Alvarez testified that one of the pallets was leaning over to the side, which is "a big problem with load securement." *Id.*; R. Vol. VI, Ex. 6. Officer Alvarez asked Merise to "just stand by right here" and then "crawl[ed] the rest of the load," sliding on top of the boxes in Merise's trailer to verify them and to make sure that no other pallets were leaning. R. Vol. 3 at 36, 39. At the front of the trailer, Officer Alvarez noticed that there was a pallet that "was tooken [sic] apart." *Id.* at 40. Underneath that pallet were boxes that had "no type of markings or nothing on them." *Id.* Officer Alvarez then testified as follows:

> I try to open up one of the boxes to see if it's frozen food, seafood. And I couldn't open them with my hands, it was glued pretty tight. So I poked it with my knife, and I hit a bundle, and I couldn't tell what it was. So I kept– I stuck my knife in it a little bit more, and then I could smell the odor of marijuana.

*Id.* Officer Alvarez then "crawled back and exited the rear of the trailer" and placed Merise under arrest. *Id.* at 42.

Officer Alvarez testified that after Merise was placed under arrest, he called his supervisors to tell them what he found. *Id.* at 49. He and two other officers removed the unmarked white boxes from the trailer by picking them up and sliding them across the tops of the other boxes in the trailer. *Id.* at 41, 51. One of the officers who helped

remove the boxes of contraband, Officer Benjamin Strain, testified that in order to remove the boxes of contraband, he had to break down the pallet on top of the boxes by tearing apart the plastic and moving the boxes to the side in order to get to the boxes of contraband. *Id.* at 68 (testifying concerning R. Vol. VI, Ex. 9a). Officer Strain testified that the boxes of contraband "weren't professionally wrapped," because "the material that was wrapped around it was a little bit looser than . . . [the] legitimate load." *Id.* at 69 (testifying concerning R. Vol. VI, Ex. 9b). Officer Strain further testified that the boxes of contraband were "probably twice as large" as the boxes containing the legitimate load. *Id.* at 69-70.

Agent Darren Rhoden of the Drug Enforcement Administration testified that a total of seven white, unmarked boxes containing contraband were recovered from the trailer. *Id.* at 198-99. Agent Rhoden testified that each box measured about two-and-a-half feet by two-and-a-half feet by three feet and weighed approximately eighty-five pounds. *Id.* at 198. Agent Rhoden further testified that the drive between Los Angeles and Lordsburg takes ten hours, without stops or breaks. *Id.* at 202.

Items that were collected and inventoried from Merise's truck included his logbooks, receipts, other miscellaneous papers, and $3,100 cash. *Id.* at 191. A receipt dated December 11, 2008 from L.A. Cold Storage documented a fifteen dollar cash purchase of shrink wrap. R. Vol. VI, Ex. 13. A weigh station receipt from Los Angeles dated December 12, 2008 is time-stamped around 4:00 p.m., and indicates that at that time, Merise's truck weighed 75,400 pounds. *Id.*, Ex. 22. A receipt from Ehrenberg,

Arizona on December 12, 2008 is time stamped 11:38 p.m. *Id.*, Ex. 15. A receipt from Danny's - A Big Rig Resort in Phoenix, Arizona dated December 13, 2008 is time stamped 11:13 a.m. *Id.*, Ex. 20.

### B. Witness Testimony

The government introduced testimony from six witnesses from the cold storage and brokerage companies with which Merise transacted business. Richard Cutchin, a manager for broker H&M Bay, testified that Merise was hired by H&M Bay to pick up frozen food items in the Los Angeles area and to transport them to the east coast where he had six deliveries to make. R. Vol. 3 at 11, 24-25; R. Vol. VI, Ex. 16. Merise was scheduled to pick up frozen food items from Glacier Cold Storage, two locations of Preferred Freezer Services (one on Bandini Boulevard, "PFS-Bandini," and one on Washington Boulevard, "PFS-Washington"),[1] and L.A. Cold Storage. R. Vol. 3 at 30. Cutchin also explained H&M Bay's shipping procedures in the long-haul trucking industry, testifying that when a driver picks up multiple loads from different locations, the load is not necessarily sealed because the seal would have to be broken every time the driver picked up or dropped off part of the load. *Id.* at 12. Once a load is placed in a driver's truck, the driver is responsible for its contents. *Id.* at 24. Cutchin further testified that the average size of boxes used in the frozen food industry is twelve inches by twelve inches by eight inches and average weight of each box is roughly ten pounds. *Id.* at 21.

---

[1] In his testimony, Cutchin refers to Preferred Freezer Services as "Preferred Cold Storage."

Vicente Munoz, an employee at Glacier Cold Storage, testified that on December 11, 2008, he loaded four pallets of veal onto Merise's trailer. *Id.* at 75. The boxes on the pallets were labeled "Nagle Veal" and each of the boxes weighed about ten to fifteen pounds. *Id.* at 76. Munoz reviewed a photograph of the unlabeled boxes of contraband, R. Vol. VI, Ex. 11, and testified that he did not load those boxes onto Merise's trailer. R. Vol. 3 at 77. Munoz further testified that he did not unload anything from Merise's trailer, nor did he rearrange the contents of Merise's trailer. *Id.* at 78-79.

Roger Hatfield, a customer service manager for Glacier Cold Storage, testified regarding Glacier's inventory control procedures. *Id.* at 86. If an unlabeled, white box were to come into the facility, Hatfield testified that he would have to call the customer immediately to inform him that the product could not be verified. *Id.* at 87-88. Hatfield further testified that if he did not have a bill of lading for a particular item, he would not receive it because Glacier is responsible for any overages or shortages of product. *Id.* at 88. Although Glacier will rearrange loads on trucks for H&M Bay, Hatfield testified that Merise's transaction was not billed for the rearranging service. *Id.* at 98-99. Rather, Hatfield testified that the bill of lading indicated that Glacier did not restack or rearrange any of the product that was loaded on Merise's truck. *Id.* at 100-101.

Thomas L. Thomas, vice president of L.A. Cold Storage Company, testified that his company warehouses frozen food for other companies. *Id.* at 107. Thomas reviewed the bill of lading from L.A. Cold Storage that was recovered from Merise's truck, R. Vol. VI, Ex. 21, and noted the date and time-stamp of December 11, 2008 at 11:22 a.m. R.

Vol. 3 at 113-15. Thomas testified that the bill of lading showed that Merise picked up 118 cases of frozen shrimp owned by Contessa Premium Foods from the L.A. Cold Storage facility. *Id.* at 113-14. Thomas testified that security cameras at L.A. Cold Storage recorded the loading of Merise's trailer while he was at L.A. Cold Storage, clips of which were played for the jury. *Id.* at 116. The video showed an individual wearing an orange hat and a black jacket standing on the loading dock and facing the inside of Merise's trailer. *Id.* at 117-18. The video also showed a worker consolidating a half pallet of boxes on top of a full pallet to maximize the height on the pallet. *Id.* at 121. Thomas testified that drivers want to maximize the height on the pallets so they can get more product onto their truck. *Id.* According to Thomas, no one would rearrange the pallets without being asked to do so by the driver. *Id.* Thomas reviewed a video clip played for the jury and identified the ten- to twenty-pound brown cartons of Contessa frozen shrimp as they were shown being loaded onto Merise's trailer. *Id.* at 122-23, 132. Thomas testified that his review of the surveillance video did not reveal any large, white, unlabeled boxes that were loaded onto Merise's trailer at L.A. Cold Storage. *Id.* at 133-34.

Peter Godsil, the general manager of PFS-Bandini, testified that every box that enters the PFS-Bandini facility is stamped or stickered with a lot number for inventory control purposes. *Id.* at 140-41. Godsil testified that PFS-Bandini is a driver-loaded facility where truck drivers are generally responsible for shrink wrapping their own loads and for having them loaded onto their trailers. *Id.* at 154-55. Godsil testified that his

review of the video surveillance footage from Merise's loading showed that Merise, identified as "the guy in the orange hat," was watching the loading process. *Id.* at 151. Godsil testified that he was able to identify everything that was loaded onto Merise's trailer. *Id.* at 149-53. Godsil further testified that, based on his review of the video, the large, white, unmarked boxes containing marijuana were not loaded onto Merise's trailer at PFS-Bandini. *Id.* at 153 (testifying based on the white boxes of contraband shown in R. Vol. VI., Ex. 11).

Tommy Abbott, the general manager at PFS-Washington, testified that products received in the PFS-Washington facility are assigned a lot number, and that nothing is placed in freezers for storage without a lot number. *Id.* at 168-69. If an unmarked box were to arrive at the facility, PFS-Washington would immediately notify the customer and the customer would instruct PFS-Washington as to whether to inspect the product and label it accordingly, or to refuse it. *Id.* at 169. Abbott further testified that when a driver arrives to pick up a load, the product is checked three times before it is released to the driver. *Id.* at 169-70. Abbott reviewed the bill of lading from PFS-Washington that was found in Merise's truck, *id.* at 172 (reviewing R. Vol. VI, Ex. 17), and testified that it showed that Merise had picked up 136 cases of frozen shrimp from PFS-Washington. *Id.* at 172-73. Abbott testified that each case of shrimp would have been labeled with identifying marks on each box and that each box would have been approximately eighteen inches by twelve inches by eight inches in size. *Id.* at 174. Abbott pointed out

representative boxes to the jury. *Id.* at 175-76 (reviewing R. Vol. VI, Ex. 9a[2]). Abbott reviewed a photo of the partial pallet of boxes that contained the marijuana, R. Vol. VI, Ex. 11, and testified that the boxes containing the contraband were significantly bigger than the boxes of frozen shrimp that Merise picked up from PFS-Washington, and that the pallet of contraband was not as neatly wrapped as the pallets Merise had loaded at PFS-Washington. R. Vol. 3 at 177.

### C.    Testimony of Merise

Merise testified that when he arrived in Los Angeles to pick up the loads for H&M Bay from the four freezer facilities, his trailer was empty. *Id.* at 220, 222. Merise testified that his last stop was at Glacier Cold Storage, where he picked up product and had his load rearranged. *Id.* at 222. Merise testified that he left Glacier around 3:45 p.m. on Friday afternoon, then had his truck weighed around 4:00 p.m. *Id.* at 223.

Merise testified that he did not purchase the roll of shrink wrap at L.A. Cold Storage and that someone who had been helping him load his trailer had purchased the shrink wrap. *Id.* at 234. Merise testified that he is not entirely truthful in his logbook entries because he cannot make a good living by driving ten hours a day as the Department of Transportation regulations permit. *Id.* at 236. Merise testified that he would rather be fined $400 for a logbook violation than be fined by the broker for delivering product late or restricting his driving hours and potentially missing his

---

[2] Abbott's testimony reflects that he was testifying regarding Exhibit 9. Exhibits 9a and 9b were submitted in the appellate record and the exhibit Abbott reviewed appears to be Exhibit 9a.

scheduled delivery appointments. *Id.* at 236-38. Merise also testified that the $3,100 cash that was found in his truck would pay for filling up his 300-gallon fuel tank twice, and for paying lumpers to help him unload product at the delivery destinations. *Id.* at 243. Merise testified that his business is operated on cash flow only and that he does not have a credit card. *Id.*

Merise testified that he had been stopped at the Lordsburg port of entry on three previous occasions within the last six months and that his truck had not been inspected there previously. *Id.* at 240. Merise also testified that the padlock securing the trailer door belonged to him, and that he had the key to the padlock. *Id.* at 251. Merise also testified that he was the man in the videos shown to the jury, wearing an orange baseball cap, a dark jacket, and dark jeans. *Id.* at 252.

## II. DISCUSSION

The only issue Merise raises on appeal is whether the evidence was sufficient for a jury to find him guilty beyond a reasonable doubt of knowingly or intentionally possessing with intent to distribute more than 100 kilograms of marijuana. Merise stipulated that 277 kilograms of marijuana was found in his trailer, and that this amount of marijuana was indicative of distribution. R. Vol. 3 at 189; R. Vol. VI, Ex. 1. Thus, we need only determine whether the evidence was sufficient for a jury to find, beyond a reasonable doubt, that Merise knowingly or intentionally possessed the marijuana.

We review de novo the sufficiency of the evidence to support a jury's verdict. *United States v. Jameson*, 478 F.3d 1204, 1208 (10th Cir. 2007) (citing *United States v.*

*Lewis*, 240 F.3d 866, 870 (10th Cir. 2001)). On appeal, "[w]e ask 'whether taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt.'" *Id.* (quoting *United States v. Hanzlicek*, 187 F.3d 1228, 1239 (10th Cir. 1999)). However, "an inference must be more than speculation and conjecture to be reasonable, and 'caution must be taken that the conviction not be obtained by 'piling inference on inference.'"" *United States v. Jones*, 44 F.3d 960, 865 (quoting *United States v. Butler*, 494 F.2d 1246, 1252 (10th Cir. 1974) (quoting *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943))). A conviction should be reversed only if "no reasonable juror could have reached the disputed verdict." *United States v. Carter*, 130 F.3d 1432, 1439 (10th Cir. 1997) (citations omitted).

In this case, Merise argues that there was insufficient evidence for a jury to find that he possessed the marijuana found in his trailer. Possession may be actual or constructive. *See United States v. Winder*, 557 F.3d 1129, 1137 (10th Cir. 2009) (citing *United States v. Delgado-Uribe*, 363 F.3d 1077, 1084 (10th Cir. 2004)). "'[C]onstructive possession may be found if a person knowingly has ownership, dominion, or control over the narcotics and the premises where [they] are found.'" *United States v. Triana*, 477 F.3d 1189, 1194 (10th Cir. 2007) (quoting *United States v. Reece*, 86 F.3d 994, 996 (10th Cir. 1996)) (second alteration in original). Constructive possession has been "alternatively defined . . . as 'an appreciable ability to guide the destiny of the drug.'" *United States v. McCullough*, 457 F.3d 1150, 1168 (10th Cir. 2006) (quoting *United*

*States v. Carter*, 130 F.3d 1432, 1441 (10th Cir. 1997)). However, "[w]here possession is not clear, such as when the contraband may be attributed to more than one individual, constructive possession requires some nexus, link, or other connection between the defendant and the contraband." *Reece*, 86 F.3d at 996.

Merise argues that multiple people had access to his trailer while it was being loaded, therefore the government had to prove some nexus or link between him and the contraband in order to show that he possessed it. In support of his proposition, Merise cites *United States v. Lazcano-Villalobos*, 175 F.3d 838 (10th Cir. 1999), *United States v. Valadez-Gallegos*, 162 F.3d 1256 (10th Cir. 1998), and *Reece*, 86 F.3d 994. However, as the government points out, each of those cases is a joint occupancy case where another individual occupied the vehicle with the defendant when the contraband was found such that possession of the contraband could not be attributed to just one person. *See Lazcano-Villalobos*, 175 F.3d at 840 (defendant and his wife jointly occupied the vehicle stopped at a United States Border Patrol checkpoint where narcotics were found in a hidden compartment in the vehicle's dashboard); *Valadez-Gallegos*, 162 F.3d at 1264 (reversing conviction where the government did not present evidence linking the defendant, the passenger in a vehicle, to the contraband found in a hidden compartment in a camper attached to the vehicle); *Reece*, 86 F.3d at 996-97 (reversing conviction where the government failed to establish a nexus between the defendant, the driver of the vehicle, and the drugs which were found on the passenger's person and in the vehicle's glove compartment where the passenger testified to hiding them when the vehicle was pulled

- 12 -

over and further testified that the defendant had no knowledge of the drugs prior to that moment).  In the instant case, however, Merise was alone in his truck.  He had no passenger, and there is no other individual to whom the drugs would be attributable.

Merise argues that his case is a joint occupancy case because others had access to the contents of his trailer while his cargo was being loaded.  Yet, Merise's argument is unavailing for at least three reasons.  First, even though multiple people had access to Merise's trailer while it was being loaded, the government introduced evidence that the contraband was likely not loaded into Merise's truck at any of the four cold storage facilities where he picked up cargo.  Footage from surveillance cameras at two facilities, L.A. Cold Storage and PFS-Bandini, was reviewed by managers from each of the respective sites.  Thomas, the manager at L.A. Cold Storage, testified that the surveillance footage did not show any loading of the large, unmarked, white boxes containing the contraband into Merise's trailer at L.A. Cold Storage.  Godsil, manager at PFS-Bandini, testified that he could identify everything that was loaded onto Merise's truck at PFS-Bandini and that based on his review of the video, the large, unmarked, white boxes containing the contraband were not loaded onto Merise's trailer at the PFS-Bandini facility.

At the two facilities lacking video surveillance footage, PFS-Washington and Glacier Cold Storage, employees testified that their extensive inventory control measures made it unlikely that large, unmarked white boxes such as the ones in which the contraband was stored would be received into the facility or go unnoticed.  For example,

Hatfield testified that at Glacier Cold Storage, the facility would not receive unmarked boxes such as the ones in which the marijuana was stored. If unmarked boxes were to arrive at the facility, Hatfield testified that they would ask the customer to identify the product. Similarly, Abbott testified that at PFS-Washington, if an unlabeled box were to come in, the applicable customer would be notified immediately and asked to identify the product. Abbott also testified that when a truck driver arrives to pick up a load, the load is checked three times before it is released to the driver. Abbott's testimony indicates that the unmarked boxes containing the contraband would not have been stored with the legitimate cargo and it is unlikely they would have been processed through the PFS-Washington facilities without being otherwise noticed. Abbott also testified that the boxes of contraband were considerably larger than conventional boxes used to transport frozen food, and that the shrink wrap around the pallet of contraband was not professionally shrink wrapped. Thus, a reasonable jury could conclude that the contraband was not loaded into Merise's trailer at any of the four cold storage facilities where Merise picked up cargo.

Second, contrary to Merise's testimony that his last stop prior to leaving Los Angeles was at Glacier Cold Storage on Friday, December 12, 2008 for his load to be rearranged, the evidence introduced by the government indicates that his load was not rearranged, and that he did not stop at Glacier Cold Storage on Friday, December 12, 2008. Glacier Cold Storage employee Munoz testified that Merise picked up his load on Thursday, December 11, 2008 and that he did not rearrange Merise's load. The bill of

- 14 -

lading found in Merise's truck from Glacier Cold Storage also reflected a pick up date of December 11, 2008. Hatfield, a customer service manager for Glacier Cold Storage further testified that if Glacier had been contracted to rearrange Merise's load, the transaction would have been billed accordingly, and the bill of lading for Merise's transaction did not reflect any rearranging services. Thus, a reasonable jury could conclude that the rearranging of the contents of Merise's trailer, potentially giving another person access to the entire contents of Merise's trailer, never took place.

Third, the government also introduced evidence that for roughly twenty-four hours after Merise left Los Angeles until he arrived in the Lordsburg port of entry, he was in exclusive control of his trailer. He was the only driver on his return trip from Los Angeles to the east coast and there was no evidence that he had another passenger during that time period. Thus, Merise's case is a single-occupancy case. The government did not have to further establish a nexus or link between him and the contraband in order for the jury to find that Merise constructively possessed the contraband.

As the single occupant of his truck, evidence presented to the jury supports the conclusion that Merise exercised ownership, dominion, or control over the contraband and the trailer where it was found. Merise owned his truck and was in the process of purchasing the trailer that contained the contraband. A reasonable jury could similarly conclude that Merise could appreciably guide the destiny of his trailer's contents. The door to the trailer was also padlocked and Merise had the key to unlock it. He did not have a co-driver for the trip from Los Angeles to the east coast, and was thus in charge of

determining his own driving times and routes. Thus, a reasonable jury could infer that Merise exercised dominion and control, and therefore constructive possession, over the trailer and its contents.

The jury was also presented with evidence such that it could reasonably find that Merise's possession of the contraband was knowing or intentional. Our precedent holds that "a jury [may] infer [that] the driver of a vehicle has knowledge of the drugs contained within it." *United States v. Gwathney*, 465 F.3d 1133 (10th Cir. 2006) (citations omitted); *see also United States v. Cota-Meza*, 367 F.3d 1218, 1222 (10th Cir. 2004) (citing *United States v. Levario*, 877 F.2d 1483, 1485-86 (10th Cir. 1989), *overruled on other grounds by Gozlon-Peretz v. United States*, 498 U.S. 395 (1991)). An inference of knowledge arises if the defendant has exclusive possession of the object or premises. *Lazcano-Villalobos*, 175 F.3d at 843 (citing *United States v. Taylor*, 113 F.3d 1136, 1145 (10th Cir. 1997); *United States v. Mills*, 29 F.3d 545, 549 (10th Cir. 1994)). As discussed above, because Merise was the sole driver of his truck and had exclusive possession of it, a reasonable jury could infer that he had knowledge of the drugs contained within it.

Moreover, contrary to Merise's testimony that he did not inspect his load to verify that he received the products listed on the bills of lading, the government showed the jury footage of Merise standing on the loading dock supervising the loading of his trucks at both L.A. Cold Storage and at PFS-Bandini. Witnesses Cutchin, Munoz, Thomas, and Abbott testified concerning the physical dimensions of the cargo Merise picked up at their facilities and that their weight was lighter than the boxes containing the contraband.

Thus, given the videotape footage and the testimony of employees at each of the four frozen food facilities, a reasonable jury could have concluded that Merise could distinguish the contraband from the legitimate cargo and would have known when the contraband was loaded onto his truck.

Merise argues that "accurate and precise information" about his route was necessary for him to do business with H&M Bay because "[t]he service provided by H&M Bay Co. depended upon employees knowing with certainty which loads would be dropped off where and when." Appellant's Br. 12. Thus, Merise argues that "[t]he jury could only have guessed whether a marijuana smuggler would have made sure that the driver be [sic] aware of the contraband in the trailer." *Id.* It is possible that a marijuana smuggler who knew Merise's route was able to break into Merise's padlocked trailer and hide seven large, unmarked white boxes of contraband in the front part of Merise's trailer under a pallet of frozen shrimp and hope that it would arrive at its intended destination and be accessible, all without Merise's knowledge. However, to sustain Merise's conviction, the government's evidence "need not disprove every other reasonable theory of the case." *United States v. Winder*, 557 F.3d 1129, 1137 (10th Cir. 2009) (citing *United States v. Caraway*, 534 F.3d 1290, 1293 (10th Cir. 2008)). Merise testified that his truck was empty when he arrived in Los Angeles to begin picking up frozen foods. He testified that he had a volunteer co-driver on his drive into Los Angeles from [Florida], but that volunteer co-driver stayed behind in Los Angeles. Moreover, as the government pointed out, Merise was alone with his truck for the approximately 24 hours

after he picked up his last load in Los Angeles around 4:00 p.m. on December 12, 2008, and when he arrived in the Lordsburg port of entry around 4:25 p.m. the next day, a drive that Agent Rhoden testified would take ten hours if it was done without breaks. Taking inferences in favor of the verdict, given the evidence that the contraband was likely not loaded at any one of the four frozen food facilities, a reasonable jury could have found that the contraband was loaded elsewhere with Merise's knowledge.

Lastly, Merise argues that his lack of nervous behavior, and the lack of any evidence suggesting his attempting to mask the smell of the marijuana, were strongly indicative of his innocence. Yet, a reasonable jury could infer that because Merise had been previously stopped at the Lordsburg port of entry but had not been asked to open his trailer, he may have assumed that his trailer would not be inspected in the instant case. Moreover, Officer Alvarez testified that he could not detect what the large, unmarked white boxes contained when he cut open the first box of contraband because the box was tightly glued shut. Therefore, the lack of Merise's attempting to mask the smell of marijuana does not necessarily weigh against a finding that he knew that the contraband was in his trailer and we are not persuaded that his lack of nervousness compels a different conclusion.

Given the evidence above, we hold that a reasonable jury could conclude that Merise knowingly possessed the contraband with an intent to distribute it. Thus the record satisfied the standard for proof to support a criminal conviction.

### III.  CONCLUSION

Thus, we AFFIRM Merise's conviction.

Entered for the Court


William J. Holloway, Jr.
Circuit Judge