HARDIMAN, Circuit Judge,
dissenting.
The jury unanimously determined beyond a reasonable doubt that Rashaan Bates constructively possessed heroin stashed at the residence he had recently vacated. The seasoned trial judge, after giving careful consideration to the applicable precedents, found the evidence sufficient to support the conviction. We should affirm that decision.
I
In a constructive possession case, the Government must establish that the defendant “knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons.” United States v. Iafelice, 978 F.2d 92, 96 (3d Cir.1992). Although we have found that “mere proximity to the drug, or mere presence on the property where it is located or mere association with the person who does control the drug or the property[ ] is insufficient to support a finding of possession[,] ... dominion and control need not be exclusive but may be shared with others.” United States v. Davis, 461 F.2d 1026, 1035-36 (3d Cir.1972).
II
As it was required to do, the District Court reviewed the evidence in the light most favorable to the verdict. That evidence includes the following pertinent facts.
Bates’s mother leased 1474 Lardner Street in Philadelphia (the Premises) for one year, from August' 9, 2008, until September 10, 2008. Bates lived with her there for about the last six months of her tenancy and listed the Premises as his residence on his Pennsylvania driver’s license. About six days after her tenancy expired, Bates’s mother returned her keys to the property manager, Tom Zhang.
Bates remained active on the 1400 block of Lardner Street after September 10, 2008. On October 7, 2008, Philadelphia *254 Police Officers witnessed Bates selling crack cocaine to a confidential informant on the front steps of 1471 Lardner Street. Shortly before that controlled purchase, Officer Harold Toomer saw Bates exit the Premises and cross the street. After the drug deal, Bates crossed the street again and entered 1446 Lardner Street.
Based on the foregoing, search warrants were procured for the two properties Bates had entered or exited (1446 and 1474 Lardner). When officers arrived to execute the warrants on October 8, 2008, they found Bates again sitting on the front steps of 1471 Lardner. A search of Bates’s person yielded twelve packets of crack cocaine and a loaded Intratec nine-millimeter Luger semi-automatic handgun with an obliterated serial number. And despite the fact that Bates’s mother testified that her son never had a key to the Premises, officers found a key to that residence on Bates’s person.
Inside the Premises, officers found 707 grams of heroin, including “bulk heroin [and] packaged heroin, ... heroin paraphernalia used to package heroin,” a credit card covered in heroin residue, a ledger book written mostly in Spanish, a rubber stamp bearing the word “Chicago,” and a box containing blue and green glassine packets. There were no beds in the Premises and almost no furniture. Officer Brian Myers described the Premises as follows:
When you first walk into 1474 Lardner Street, you walk into a living room. I remember there was a couch and a TV. That was the only thing down there. There was nothing in the kitchen, nothing in the dining room. As you walk in the front door to your right, there was [sic] stairs to go upstairs, you go upstairs. In the front room there’s a table and I think one or two chairs. No bedroom set that I remember and no furniture in any other — I think there was [sic] two other bedrooms but no furniture in them.
Like Officer Myers, property manager Zhang testified that as of October 8, 2008, the Premises, which he had secured with a lock box a few weeks earlier, was unoccupied.
The jury also heard testimony from a Government expert, Detective Andrew Callaghan. Callaghan opined that the crack cocaine found on Bates was likely meant for sale rather than for personal use because Bates was not carrying any user paraphernalia. Noting that Bates carried a handgun, Callaghan explained that “it’s extremely, extremely rare that a user [who is] just purchasing any type of illegal drug would possess a loaded firearm.”
Callaghan further testified that the heroin found at the Premises could be sold for well over $200,000 and explained that such a large quantity would be stored in a secure location and sold elsewhere to evade detection by police or potential thieves:
I’ve never seized a large amount of heroin in an open location where other people had access to it. Drug organizations usually secure and secrete the evidence. You know, if there’s a location that drugs are stored at, if it’s this amount, they usually don’t conduct sales out of it because ... they don’t want law enforcement to detect that location ... and [because of] street thugs, is what we call them, you know, guys that commit a robbery on a drug house because those types of robberies are seldom, if ever, reported.... So that’s the main reason why they keep a separate and secure location.
Callaghan also testified that because “[i]t would take multiple persons in order to sell this heroin to be able to pay that shipment off,” the operation likely involved “[m]ore than one individual.” He went on to explain that while the majority of heroin *255 in Philadelphia is distributed by Hispanics and “usually the leaders of an organization in a heroin trade are Latino[,] ... often the customers and the workers aren’t.”
To sum up, the evidence showed that Bates was an armed drug dealer who im-permissibly retained a key to a locked Premises where over $200,000 of heroin was seized and that the seizure occurred on a day when Bates was eyeballing the Premises, the day after Bates was seen leaving it.
Ill
In light of the undisputed facts, two questions arise: to whom did the heroin belong, and who was in charge of it while it was stashed at the Premises? I agree with Bates that the evidence supports the conclusion that the heroin belonged to one or more Hispanics. This theory is well supported not only by the documents written in Spanish and the Hispanic name on the credit card used to cut the heroin, but also by the testimony of the Government’s expert, Detective Callaghan. But who was in charge of the heroin while it was stashed at the Premises?
The record indicates that two people had access to the locked Premises: Zhang, the property manager, and Bates. Although it is theoretically possible that Zhang allowed the drug cartel to use the Premises to stash and process the heroin, the jury rationally concluded that Bates — the armed drug dealer who operated across the street from the Premises and was seen exiting the Premises the day before the seizure — was watching over the Premises where the heroin was stashed.
My colleagues conclude that this case is indistinguishable from our two most germane precedents: United States v. Brown, 3 F.3d 673 (3d Cir.1993), and United States v. Jenkins, 90 F.3d 814 (3d Cir.1996). As the District Court explained, however, the evidence presented against Bates was markedly stronger than the evidence in either Brown or Jenkins. “In addition to evidence that Bates previously resided at 1474 Lardner Street and possessed a key to the building,” the Government also showed: (1) on the day prior to his arrest, “Bates exited 1474 Lardner Street and immediately proceeded to engage in a drug transaction;” (2) “Bates was arrested across the street from 1474 Lardner Street” with crack cocaine and a firearm on his person; (3) “1474 Lardner Street was a crack house[1] where no one resided;” and (4) “only trusted members of the drug distribution group would have access to the building.” United States v. Bates, No. 09-33-1, 2010 WL 3421118, at *7 (E.D.Pa. Aug.26, 2010). The District Court held that “[tjhese additional pieces of evidence, viewed in the light most favorable to the Government and in conjunction with the entirety of the evidence in this case, [were] sufficient for the jury to find Bates guilty beyond a reasonable doubt of possession with intent to distribute 100 grams or more of heroin.” Id.
I agree with the District Court for several reasons. First, the jury could reasonably have concluded that on the day of Bates’s arrest, the Premises was not a home, as in Brown, but rather a “dwelling used exclusively for the use and distribution of drugs.” Brown, 3 F.3d at 683. Second, the jury was entitled to credit Callaghan’s expert opinion that only trusted members of the drug organization would have access to such a large quantity of heroin. Third, the jury could infer from Bates’s possession of the key — which, curiously, his mother denied he ever pos *256 sessed — that, unlike Jenkins, Bates “could enter the building unimpeded and had unfettered access to its contents.” Bates, 2010 WL 3421118, at *7. Finally, the jury could consider the fact that “Bates engaged in drug trafficking on the 1400 block of Lardner” and was found across the street from the Premises with crack and a loaded firearm “that was a tool of the drug trade.” Id. at *8.
IV
Among the several factors cited by the District Court, the most significant distinguishing characteristic is that the heroin was found in a vacant home that was being used to stash, cut, and package the drug. In Brown, we reversed the conviction of Ama Baltimore, who had been arrested as she entered her own home during a police search. 3 F.3d at 673. Essential to our decision was the fact that the property had a legitimate use, ie., as a residence. Id. at 683-84 (“Possession of the key to [a] crack house would indicate a much greater likelihood that the defendant was involved with the drugs found therein than [his] possession of a key to [a] home, which was used not only for drug-related activity but also as a residence.”). My colleagues note that the Premises was “not fortified, was used as a residence three weeks earlier,” and was scheduled to receive new tenants “only three weeks later,” to suggest that it is not analogous to the “fortified drug house” raided in United States v. Brett, 872 F.2d 1365 (8th Cir.1989). But the fact that the Premises was not “fortified” does not detract from the plain fact that it was a secure location used only for illicit purposes during the relevant time period.
My colleagues correctly note that we have said that the Brett defendant’s “possession of the key to the house was only one among a number of factors all of which supported the conclusion that he knew about and had dominion and control over the drugs found in the crack house.” Brown, 3 F.3d at 684. They are also correct that the evidence of guilt was more pronounced in Brett than in this case. This does not mean, however, that a reasonable jury could not have convicted Bates. His possession of the key to the Premises was just one of many factors that supported the jury’s decision. The fact and location of Bates’s drug dealing, his loaded semi-automatic weapon, and the expert testimony regarding the heroin were all before the jury.
Nor am I persuaded by the Majority’s application of Jenkins to this case. The defendant in Jenkins was arrested in the home of an acquaintance while sitting in front of a coffee table strewn with drugs and packaging materials. 90 F.3d at 816. There was no evidence that he possessed a key to the apartment or had ever visited it while its owner was absent. Id. at 820. Unlike Bates, Jenkins was deemed a social guest who was not permitted to access the drugs on his own. Id. at 820-21.
After we decided Brown and Jenkins, we held in Jackson v. Byrd that a state trial court’s findings of fact sufficiently supported Christine Jackson’s conviction for constructive possession of drugs found in her brother’s bedroom, which was located in the apartment she was leasing. 105 F.3d 145, 150 (3d Cir.1997). We distinguished Jenkins, noting that while “there were adults other than the appellant inside” the home where the police arrested Jenkins, “Jackson’s situation was different because ... except for her young son, she was alone in the apartment when the police executed the warrant [and] had ready access to the drugs as they were in the unlocked rear bedroom.” Id.
Jenkins is distinguishable from this case for the same reason. The few eases, like Brown and Jenkins, in which federal appellate courts have found insufficient evidence to support a jury’s finding of con *257 structive possession, share a common theme noticeably absent here. In those cases, the defendant was either accompanied by or living with another individual who exercised dominion and control over the drugs confiscated at the scene. See, e.g., United States v. Scofield, 433 F.3d 580, 585-86 (8th Cir.2006) (defendant was present in a drug dealer’s home while the dealer sold methamphetamine to an informant); United States v. Valadez-Gallegos, 162 F.3d 1256, 1262-63 (10th Cir.1998) (defendant was a passenger in a vehicle in which ephedrine was found); United States v. Valenzuela, 596 F.2d 824, 830-31 (9th Cir.1979) (defendant lived with her husband on the premises where heroin was found and attempted to push the door shut when officers tried to execute warrant); Avellanes v. United States, 302 F.2d 603, 606-07 (9th Cir.1962) (defendant lived with her husband in an apartment where drugs were found and accompanied him in the car in which drugs were transported).
Like Christine Jackson — whose conviction we affirmed — Bates was the only adult seen either entering or exiting the Premises in the two days leading to his arrest. Bates carried a key, enjoyed unfettered access to the drugs, and had “some appreciable ability to guide the destiny of the drug.” United States v. Staten, 581 F.2d 878, 883 (D.C.Cir.1978). And even more telling than in Jackson’s case, Bates was dealing drugs and toting a loaded semi-automatic weapon.
V
This is not a case like Broten, where the defendant had a legitimate reason to carry a key to a home where drugs were found. Nor is it a case like Jenkins, where the defendant’s access to the drugs was dependent upon another person. Like Ama Baltimore, Bates carried a key giving him unfettered access to the home and, like Jenkins, he was in close proximity to the drugs as he exited the Premises. Although we have held that these factors do not alone suffice to demonstrate constructive possession, we have never found that they are inadequate when considered together and with other evidence, including a defendant’s history of drug trafficking, his armed monitoring of the location, and an expert’s testimony that access to that location would be limited to trusted confederates of the drug ring.
The evidence against Bates can be construed as pointing to either innocence or guilt, but characterizing it in the light most favorable to the Government reveals that the jury’s decision to embrace the latter conclusion was reasonable. Because a rational jury could and did conclude that Bates had constructive possession over the heroin at the Premises on the day of his arrest, I respectfully dissent.

. The use of the phrase "crack house" is not accurate because the seizure at the Premises yielded no crack cocaine. This misnomer is immaterial, however, because the point here is that the Premises was unoccupied.